# OKLAHOMA ET AL. *v.* NEW MEXICO

No. 109, Orig. Argued April 16, 1991—Decided June 17, 1991

*Marian Matthews*, Deputy Attorney General of New Mexico, argued the cause for defendant. On the briefs were *Thomas S. Udall*, Attorney General, *Hal Stratton*, former Attorney General, and *Eric Richard Biggs* and *Martha C. Franks*, Special Assistant Attorneys General.

*D. Paul Elliott*, Assistant Attorney General, argued the cause for plaintiff State of Texas. With him on the briefs were *Dan Morales*, Attorney General, *Jim Mattox*, former Attorney General, *Will Pryor*, First Assistant Attorney General, *Mary F. Keller*, Executive Assistant Attorney General, and *Nancy N. Lynch*, Assistant Attorney General.

*R. Thomas Lay* argued the cause for plaintiff State of Oklahoma. With him on the briefs were *Robert H. Henry*, Attorney General, *Brita E. Haugland-Cantrell*, Assistant Attorney General, and *James R. Barnett*.

JUSTICE WHITE delivered the opinion of the Court.

This case, an original action brought by the States of Oklahoma and Texas against the State of New Mexico, arises out of a dispute over the interpretation of various provisions of the Canadian River Compact (Compact), which was ratified by New Mexico, Oklahoma, and Texas in 1951 and consented to by Congress by the Act of May 17, 1952, 66 Stat. 74. Each State has filed exceptions to a report submitted by the Special Master (Report) appointed by this Court.

I

The Canadian River[1] is an interstate river which rises along the boundary between southeastern Colorado and northeastern New Mexico, in the vicinity of Raton, New Mexico. From its headwaters, the Canadian River flows south to the Conchas Dam in New Mexico, then generally east for 65 river miles to the Ute Reservoir in New Mexico, and then into the Texas Panhandle. After traversing the panhandle, the river flows into Oklahoma where it eventually empties into the Arkansas River, a tributary of the Mississippi.

In the late 1930's, Congress authorized, and the Corps of Engineers completed, the construction of Conchas Dam on the mainstream of the Canadian River, approximately 30 miles northwest of Tucumcari, New Mexico. Congress also authorized the Tucumcari project, a federal reclamation project designed to irrigate over 42,000 acres of land and serve the municipal and industrial needs of Tucumcari, New Mexico. The project lands are situated southeast of Conchas Dam and are served by the Conchas Canal, which diverts water from Conchas Reservoir. The project was completed in 1950.

In 1949, the Texas congressional delegation proposed that Congress authorize a massive Canadian River reclamation project, known as the Sanford project because of its proximity to Sanford, Texas, for the purpose of serving the municipal and industrial requirements of 11 Texas cities in the Texas Panhandle region. Legislation to authorize the Sanford project was introduced in the House of Representatives, along with a bill authorizing New Mexico, Oklahoma, and Texas to negotiate an interstate compact to equitably appor-

---

[1] At least one source suggests that the Canadian River was so named "by early French traders and hunters from Canada who followed it west into Spanish territory. The Fort Smith and Santa Fe pioneer trails went through the Canadian River Valley." 2 Encyclopaedia Britannica 789 (15th ed. 1985).

tion the waters of the Canadian River. The legislation authorizing the States to enter into an interstate compact was passed by Congress, and the Canadian River Compact Commission was created. The Compact Commission consisted of one commissioner from each State and one federal representative. Each commissioner and the federal representative had the assistance of engineering advisers, a group collectively known as the Engineering Advisory Committee. This committee submitted several proposals to the Compact Commission. The final draft of the Canadian River Compact was presented on December 6, 1950, and was signed on that day by the members of the Compact Commission.[2]

---

[2] The Compact provides in pertinent part as follows:

"Article I

"The major purposes of this Compact are to promote interstate comity; to remove causes of present and future controversy; to make secure and protect present developments within the States; and to provide for the construction of additional works for the conservation of the waters of Canadian River.

"Article II

"As used in this Compact:

"(a) the term 'Canadian River' means the tributary of Arkansas River which rises in northeastern New Mexico and flows in an easterly direction through New Mexico, Texas and Oklahoma and includes North Canadian River and all other tributaries of said Canadian River.

. . . . .

"(d) The term 'conservation storage' means that portion of the capacity of reservoirs available for the storage of water for subsequent release for domestic, municipal, irrigation and industrial uses, or any of them, and it excludes any portion of the capacity of reservoirs allocated solely to flood control, power production and sediment control, or any of them.

. . . . .

"Article IV

"(a) New Mexico shall have free and unrestricted use of all waters originating in the drainage basin of Canadian River above Conchas Dam.

"(b) New Mexico shall have free and unrestricted use of all waters originating in the drainage basin of Canadian River in New Mexico below Conchas Dam, provided that the amount of conservation storage in New Mexico available for impounding these waters which originate in the drainage

Congress enacted legislation authorizing the Sanford project on December 29, 1950, but as a result of an amendment proposed by the New Mexico delegation, the bill specifically provided that actual construction of the project could not commence until Congress consented to the Compact. See 64 Stat. 1124, 43 U. S. C. § 600c(b). That consent was granted on May 17, 1952, 66 Stat. 74, and the Sanford Dam, creating Lake Meredith Reservoir with a capacity of over 1.4 million acre-feet of water, was completed in 1964. Lake Meredith is approximately 165 river miles east of Ute Reservoir and is located north of Amarillo, Texas. During the 1950's, New Mexico selected a site on the Canadian River mainstream approximately 1 mile west of Logan, New Mexico, and about 45 miles downstream from Conchas Dam for the construction of Ute Dam and Reservoir. Construction of Ute Dam was completed in 1963, with an initial storage capacity of 109,600 acre-feet. In 1982, New Mexico began construction to enlarge the reservoir, and, in 1984, the enlargement was completed, giving Ute Reservoir a capacity of 272,800 acre-feet. In 1984, the reservoir's actual capacity to store water was 246,617 acre-feet, the remaining capacity being occupied by silt. The Special Master estimated that because of additional silting, reservoir storage capacity was reduced to 241,700 acre-feet in 1987 and currently is about 237,900 acre-feet. Report of Special Master 16–17.

---

basin of Canadian River below Conchas Dam shall be limited to an aggregate of two hundred thousand (200,000) acre-feet.

. . . . .

"Article VII

"The Commission may permit New Mexico to impound more water than the amount set forth in Article IV and may permit Texas to impound more water than the amount set forth in Article V . . . .

"Article VIII

"Each State shall furnish to the Commission at intervals designated by the Commission accurate records of the quantities of water stored in reservoirs pertinent to the administration of this Compact."

As early as 1982, Oklahoma and Texas expressed concern that the enlargement of Ute Reservoir would violate the 200,000 acre-feet limitation in Article IV(b) of the Compact. See n. 2, *supra*. All attempts by the Commission to resolve this budding dispute were unsuccessful, in large part because any Commission action requires a unanimous vote and New Mexico would not agree to the interpretation of the Compact proposed by Oklahoma and Texas. This litigation followed, with Oklahoma and Texas contending that Article IV(b) of the Compact imposes a 200,000 acre-feet limit on New Mexico's constructed reservoir *capacity* available for conservation storage downstream from Conchas Dam, and that capacity for the so-called "desilting pool" portion of Ute Reservoir was not exempt from the Article IV(b) limitation because it was not allocated solely to "sediment control."

In the spring of 1987, while the case was pending, the portion of the Canadian River above Conchas Dam flooded, and a sizeable quantity of water, approximately 250,000 acre-feet, spilled over Conchas Dam. This was the first major spill over Conchas Dam since 1941–1942, a spill which predated the Compact. New Mexico caught approximately 60 percent of the spill in Ute Reservoir, which filled the reservoir to its capacity, and the remaining 40 percent flowed on down the river. As of June 23, 1988, Ute Reservoir contained approximately 232,000 acre-feet of stored water, of which some 180,900 acre-feet was alleged by New Mexico to be flood water spilled from Conchas Dam earlier in 1987. Report of Special Master 47.

After New Mexico refused to count the spill waters stored in Ute Reservoir for purposes of the 200,000 acre-feet limitation in Article IV(b), Texas and Oklahoma filed a supplemental complaint in this case, claiming that if the 200,000 acre-feet limitation applies to actual *stored* water, then water spilling over Conchas Dam or seeping back from the Tucumcari project constitutes "waters which originate . . . below Conchas Dam" within the meaning of Article IV(b). New

Mexico disputed all of these contentions and argued that water which first enters the river above Conchas Dam is not subject to the Article IV(b) limitation even if it is stored in Ute Reservoir, or anywhere else in New Mexico below Conchas Dam.

We referred Texas' and Oklahoma's complaint and supplemental complaint in this original case to a Special Master. 484 U. S. 1023 (1988); 488 U. S. 989 (1988). After considering voluminous evidence, the written submissions of the States, twice hearing extended oral argument on the issues, and circulating a draft report to the States for their comments, the Master filed a Report on October 15, 1990, making the following recommendations relevant to our decision in this case:

(1) Article IV(b) imposes a limitation on stored water, not physical reservoir capacity.

(2) Waters originating in the Canadian River Basin above Conchas Dam, but reaching the mainstream of the Canadian River below Conchas Dam as a result of spills or releases from Conchas Dam or seepage and return flow from the Tucumcari project, are subject to the Article IV(b) limitation.

(3) The issue whether, and to what extent, the water in the "desilting pool" in Ute Reservoir should be exempt from the Article IV(b) limitation should be referred to the Canadian River Compact Commission for good-faith negotiations and possible resolution. The referral would be without prejudice to later invoke the Court's jurisdiction if the issue cannot be resolved within one year.

(4) If the foregoing recommendations are approved, New Mexico will have been in violation of Article IV(b) of the Compact since 1987, and the case should be returned to the Special Master for determination of any injury to Oklahoma and Texas and recommendations for appropriate relief. Report, at 24–25.

The Master also recommended that the Court use this case to articulate various jurisdictional prerequisites and proce-

dural guidelines for application in future interstate compact litigation. *Id.*, at 26–34.[3]

We ordered the Master's Report to be filed and set a briefing schedule, 498 U. S. 956 (1990), and heard oral argument on the States' exceptions to the Master's Report. We now address those exceptions in turn.

## II

Oklahoma has filed an exception to the Master's recommendation in Part VI of his Report that the Article IV(b) limitation on "conservation storage" be interpreted to apply only to the quantity of water New Mexico actually stores at Ute Reservoir for conservation purposes. As of 1984, Ute Reservoir had a storage capacity of approximately 272,800 acre-feet, although it is conceded that not all of that capacity is chargeable as existing for "conservation storage." Some of the capacity is for purposes excluded from the Compact definition of "conservation storage," such as for sediment control. Oklahoma contends that the term "conservation storage" should be interpreted to apply to the *physical capacity* of reservoirs located below Conchas Dam, a view which, if adopted, would result in a finding that New Mexico has been in violation of Article IV(b) since at least 1984, when the enlargement of Ute Reservoir was completed.

The Special Master conceded, as do we, that Oklahoma's suggested interpretation of Article IV(b)'s conservation storage limitation finds some support in the plain language of the Compact definition of "conservation storage" and in the language of Article IV(b) itself. The Compact defines "conservation storage" in pertinent part as "that portion of the *capacity* of reservoirs available for the storage of water" for various purposes and "excludes any portion of the *capacity* of

---

[3] For example, the Master recommended that state attorneys general seeking to invoke the Court's jurisdiction, or responding to such a request, certify that their States had negotiated in good faith in an attempt to resolve the dispute without resort to the Court. Report, at 32–33.

reservoirs" allocated to other purposes. Art. II(d) (emphasis added). Likewise, Article IV(b) refers to "the amount of conservation storage in New Mexico *available* for impounding these waters." (Emphasis added.) However, other provisions in the Compact appear to focus on *stored* water, not reservoir capacity. For example, Article V sets forth an elaborate formula for determining the amount of water Texas may *actually impound* at any one time; Article VII provides that the "Commission may permit *New Mexico to impound more water than the amount set forth in Article IV*" (emphasis added); and Article VIII requires each State to "furnish to the Commission at intervals designated by the Commission accurate records of the *quantities of water stored in reservoirs* pertinent to the administration of this Compact." (Emphasis added.)

We agree with the Special Master that nothing on the face of the Compact indicates a clear intention to treat the New Mexico "conservation storage" limitation differently from the Texas stored water limitation, and we see no compelling justification for doing so. In fact, several early drafts of the Compact uniformly referred to *stored* water, and only in the final draft did the "conservation storage" language appear in Article IV(b). There is nothing in the contemporaneous memoranda and statements of the Compact Commissioners and their staffs to explain exactly why this change was made; nor is there anything which indicates an intent to draw a distinction between the limitations placed on New Mexico and those placed on Texas. Rather, as the Master pointed out, it is most probable that the terms "stored water," "storage," and "conservation storage capacity" were being used loosely and interchangeably by the drafters and their staffs. See Report, at 42–43.

There is no obvious reason why Texas and Oklahoma would have wanted to restrict New Mexico's ability to increase reservoir *capacity* below Conchas Dam, particularly in light of the fact that larger reservoirs actually promote one of the

purposes stated in Article I of the Compact, which is to capture and conserve as much of the Canadian River's flood flows as possible, flows which might otherwise be dissipated and therefore wasted. Furthermore, as New Mexico points out, sedimentation alone would constantly reduce New Mexico's storage capacity below the 200,000 acre-feet limit, forcing New Mexico to repeatedly either build new reservoir capacity or enlarge existing reservoirs. Either of those options would be extremely expensive, and Oklahoma points to no persuasive evidence that the drafters of the Compact intended that New Mexico should .bear such a burden. We overrule Oklahoma's exception to Part VI of the Master's Report.

## III

New Mexico has excepted to Part VII of the Master's Report, in which the Master recommended that water spilling or released from Conchas Dam, as well as return flow and seepage from the Tucumcari project, be subject to Article IV(b)'s 200,000 acre-feet limitation on conservation storage, if the water is impounded in Ute Dam or other .downstream dams in New Mexico. New Mexico argues that the Compact does not impose any restriction on New Mexico's impoundment of these waters because they *originate above* Conchas Dam, and Article IV(a) gives New Mexico the "free and unrestricted use of all waters *originating* in the drainage basin of Canadian River *above* Conchas Dam." (Emphasis added.) Texas and Oklahoma counter that the word "originating," as used in Article IV of the Compact, simply means "entering." See Tr. of Oral Arg. 29. In Texas' and Oklahoma's view, all the conservation storage waters which end up in Ute Reservoir, whether they spill over or are released through Conchas Dam, or seep back from the Tucumcari project, are subject to the 200,000 acre-feet conservation storage limitation of Article IV(b) because they "originate" below Conchas Dam. The Special Master recommended that such waters be subject to the Article IV(b) limitation because he concluded that

the intent of the Compact drafters was to give New Mexico free and unrestricted use of waters originating in the Canadian River drainage basin above Conchas Dam *only if* the waters were "stored, used or diverted for use *at or above Conchas Dam*." Report, at 59.

New Mexico asserts that the word "originating" as used in Article IV has a plain, unambiguous meaning and that the waters "originating" below Conchas Dam referred to in Article IV(b) do not include any waters "originating" above Conchas. But we do not agree that the meaning of the word is as plain as New Mexico suggests. As the Special Master pointed out, a literal reading of the language of Article IV(a) could not have been intended since such a reading would include all of the waters originating in the drainage basin of the Canadian River above Conchas Dam, including all of the waters in tributaries that arise in Colorado, such as the Vermejo River, and would purport to foreclose any claim that Colorado had in the waters arising in that State. This would be an extremely implausible reading in light of the fact that Colorado was not a party to the Compact.

New Mexico's answer is that the language of Article IV(a), giving it the right to all Canadian River waters originating above Conchas, does not mean what it says and should be interpreted to include only those waters in the drainage basin "originating" in New Mexico, a limitation that appeared in earlier drafts of the Compact and that was reflected in the legislative history of the Act approving the Compact. S. Rep. No. 1192, 82d Cong., 2d Sess., 2 (1952). But as Texas points out, New Mexico nevertheless claims the right to use and store all of the water in the Canadian River that is found in New Mexico above Conchas Dam, even though some of it admittedly has its source in Colorado, not in New Mexico, a result unsupported by New Mexico's present interpretation of the language in Article IV(a). Likewise, if literally read, Article IV(a) would retain New Mexico's right to water having a source above Conchas even if the water escaped its

grasp and flowed into Texas; but New Mexico concedes that the Article does not go so far, if for no other reason than the fact that Article V gives Texas the right to all of the water found in the Canadian River in Texas, subject to a storage limitation.

In light of the above ambiguity, which the dissent refuses to recognize, it is fairly arguable that if, by virtue of its right to water originating in the drainage basin in New Mexico above Conchas Dam, New Mexico also has the right to use and store water in the Canadian River in New Mexico that originated in Colorado, Article IV(b) should be construed in the same way: Any water found in the river below Conchas, including spills, seepage, and return flow from Tucumcari, must be deemed to have originated below Conchas and be subject to the 200,000 acre-feet storage limitation. In effect, this was the conclusion the Special Master came to after examining in detail the purpose and negotiating history of the Compact.[4]

---

[4] In anticipation of congressional authorization to enter into a compact, the three States each appointed a compact commissioner in the fall of 1949. The Compact Commission met for the first time in February 1950 to lay the groundwork for future deliberations. At that meeting, the Commissioners agreed that no specific proposals would be considered until the relevant technical data was collected and studied. On April 29, 1950, Congress authorized the States to negotiate a compact and, approximately one month later, Berkeley Johnson was appointed to the Compact Commission as the federal representative and chairman of the Commission. Johnson then selected Raymond Hill as his engineering adviser.

The first official meeting of the Compact Commission was an organizational meeting held on June 30, 1950. Hill was named chairman of the Engineering Advising Committee, made up of three engineer advisers serving their respective Commissioners. Over the next several months, the engineer advisers conducted studies and collected data. In early October, the Compact Commission convened for its second formal meeting and received a report from Hill regarding his committee's proposals regarding a compact. The Compact Commission approved in principle the formulas developed by the engineers and directed their legal advisers to prepare a draft compact. Hill then prepared a memorandum to the legal advisers in which he recommended that New Mexico be given "free and unrestricted use of

234

The Master reviewed considerable evidence regarding the drafters' intent as to the meaning of Article IV and concluded that New Mexico's suggested interpretation was not consist-

all waters in the drainage basin of Canadian River in New Mexico" subject only to a 50,000 acre-feet conservation storage limitation in the drainage basin "above Conchas Reservoir." Defendant's Exh. 30, Exh. B, pp. 3–4. By early November, the Texas commissioner had expressed a strong desire to have a final compact draft by December 6, 1950, so that Congress could authorize the Sanford project during a month-long legislative session which was to begin in late November. The legal advisers, working with Raymond Hill and the engineers, submitted a partial draft compact dated November 14. This draft adopted Hill's suggested language with regard to New Mexico's rights to Canadian River water; but because the legal advisers had not been able "to satisfactorily word" the compact article dealing with storage limitations, they were left to be defined later. Id., Exh. C, p. 3.

The Compact Commission held its third official meeting December 4–6, 1950. On December 5, the draft compact was substantially revised by Raymond Hill and the legal advisers to reflect changes in the engineers' storage limitation formulas. This draft provided that New Mexico should have the "free and unrestricted use of all waters of the Canadian River in New Mexico, subject to" a 200,000 acre-feet storage limitation on waters "which originate in the drainage basin of the Canadian River below Conchas Dam." Id., Exh. F, p. 2. The draft was again revised either later on December 5 or during the morning of December 6. The final draft included for the first time the "originating . . . above Conchas Dam" language which is now a focal point of the States' dispute in this case. No contemporaneous explanation was provided for this last-minute revision. The final draft was presented to the Compact Commission on December 6 at 11:15 a.m., and, after making some minor revisions, the Commissioners signed the draft at 1:00 p.m., prompting Chairman Johnson to comment that the speed with which the "compact reached the signing stage . . . certainly constituted a record." Plaintiffs' Exh. 110, p. 1. The Master viewed the process somewhat less charitably, observing that "the record of the Compact negotiations and the issues raised in this litigation vividly demonstrate that, as Benjamin Franklin observed, 'haste makes waste.'" Report, at 54.

After the Compact had been signed, Chairman Johnson asked Hill to prepare, as an interpretive tool, a memorandum providing a detailed explanation of the various articles of the Compact. See Plaintiffs' Exh. 140. As evidence of the need for such a document, Johnson described a recent

ent with the available evidence.[5] Although the question is not free from doubt, we agree with the Master. Contrary to New Mexico's assertions, there is substantial evidence that, in drafting the Compact, Texas and Oklahoma agreed that storage limitations were not necessary for waters above Conchas Dam because the waters in that basin had been fully developed. "[T]he negotiators recognized that full development had already been made of all waters of Canadian River originating above Conchas Dam and that accordingly there

---

discussion involving New Mexico's Compact Commissioner and representatives of the Bureau of Reclamation and Corps of Engineers in which three different positions were taken on the interpretation of the Compact's allotment of water to Texas. Hill then prepared a memorandum entitled "Development of Final Wording of Compact," dated January 29, 1951 (the "Hill Memorandum"), see Plaintiffs' Exh. 38, and the Compact Commission approved the Hill Memorandum at its fourth and final official meeting on January 31, 1951.

[5] We agree with the Master that it is appropriate to look to extrinsic evidence of the negotiation history of the Compact in order to interpret Article IV. We previously have pointed out that a congressionally approved compact is both a contract and a statute, *Texas* v. *New Mexico*, 482 U. S. 124, 128 (1987), and we repeatedly have looked to legislative history and other extrinsic material when required to interpret a statute which is ambiguous, *Green* v. *Bock Laundry Machine Co.*, 490 U. S. 504, 511 (1989); *Pierce* v. *Underwood*, 487 U. S. 552, 564–565 (1988); *Blum* v. *Stenson*, 465 U. S. 886 (1984). Furthermore, we have on occasion looked to evidence regarding the negotiating history of other interstate compacts. See, *e. g.*, *Texas* v. *New Mexico*, 462 U. S. 554, 568, n. 14 (1983); *Arizona* v. *California*, 292 U. S. 341, 359–360 (1934). Thus, resort to extrinsic evidence of the compact negotiations in this case is entirely appropriate.

New Mexico agrees that it is proper to use "negotiating history to determine whether the words of this Compact can be interpreted reasonably in accordance with their context," Brief for New Mexico 8, n. 1, but contends that the Master used the negotiating history to "delete Compact language," *ibid.*, rather than to "interpret" the language. Essentially, New Mexico simply disagrees with the Master that the term "originating" as used in Article IV is ambiguous. Because we agree with the Master, evidence regarding the negotiating history of the Compact may be considered in interpreting Article IV even under New Mexico's view of the relevant legal principles.

would be no purpose in placing a limitation upon any increase in the amount of storage of such waters." Joint Statement of Agreed Material Facts D.34. The evidence strongly suggests that the negotiators believed that any future water development along the Canadian River in New Mexico would necessarily occur below Conchas Dam, and that 200,000 acre-feet of storage rights would be ample for New Mexico's purposes below Conchas Dam. Indeed, in a letter to the Governor, New Mexico's Compact Commissioner, John Bliss, specifically stated that "storage capacity for all projects which may be feasible below Conchas will probably not equal the 200,000 acre foot storage limit."[6] Plaintiffs' Exh. 30, p. 1.

---

[6] New Mexico attempts to rely on the fact that in a letter written to Senator Anderson of New Mexico, Bliss indicated that the only restriction on New Mexico's use of Canadian River water was that "the total storage capacity for conservation purposes of the waters rising below the dam *(not including spills)* shall not exceed 200,000 acre feet." Plaintiffs' Exh. 28 (emphasis added). New Mexico argues that this letter proves that Bliss did not construe the Compact as placing any limitation on New Mexico's right to store and use waters which flooded over Conchas Dam. But, like the Master, we fail to see that this single letter proves nearly so much.

First, it is not at all clear that an ordinary reading of the letter compels the conclusion for which New Mexico argues. At least as plausible as New Mexico's reading is the interpretation that Bliss did not understand the Compact as giving New Mexico any rights to store or use such spill waters. This reading is consistent with the plain language of the letter and extrinsic evidence such as the fact noted in the text, *infra*, at 237–238, that the engineers advising the Compact Commission included spills from Conchas Dam in their estimates of the water supply available to Texas.

Second, there is no indication that Bliss ever transmitted the view that New Mexico now claims he held to the other commissioners or the relevant New Mexico state officials such as the Governor and state legislature. In fact, in his letter to Governor Mabry, Bliss never mentions the issue of spills and instead indicates that the 200,000 acre-feet storage limitation imposed "little or no restriction" on any water development projects in the State. Plaintiffs' Exh. 30, p. 1. Bliss' subsequent letter to Governor Mechem was very similar. See Plaintiffs' Exh. 40. It is beyond cavil that statements allegedly made by, or views allegedly held by, "those engaged

The central purpose of the Compact was to settle the respective rights of the States to Canadian River water; and the Compact and its negotiating history plainly show that the parties agreed that no more than 200,000 acre-feet of storage rights would satisfy all of New Mexico's future needs for water below Conchas Dam. Had they thought more was needed, the limit would have been higher. Under these circumstances, we see no persuasive reason why Texas and Oklahoma would have agreed to let New Mexico impound substantially more than 200,000 acre-feet of water for conservation storage purposes below Conchas Dam simply because some of the water first entered the river above Conchas Dam. Nor do we believe that the evidence supports the conclusion that New Mexico's negotiator intended that result either.

In our view, the Compact's ambiguous use of the term "originating" can only be harmonized with the apparent intent of the Compact drafters if it is interpreted so that waters which spill over or are released from Conchas Dam, or which return from the Tucumcari project, are considered waters *originating below* Conchas Dam. This view is strengthened by the fact that both the Bureau of Reclamation in studying the Sanford project, and the engineers advising the Compact commissioners during negotiations, included outflows and spills from Conchas Dam in their estimates of the water supply available to Texas.[7] See Joint Statement of Agreed Ma-

---

in negotiating the treaty which were not embodied in any writing and were not communicated to the government of the negotiator or to its ratifying body," *Arizona* v. *California, supra,* at 360, are of little use in ascertaining the meaning of compact provisions.

[7] The Bureau of Reclamation, which played a significant role in providing data to the Compact Commission, interpreted the completed Compact as not entitling New Mexico to retain spills from Conchas Dam. A 1954 Bureau Report on the Sanford project stated that "[e]xcept for the contribution received from such spills [referring to Conchas Dam spills], the water supply for the Canadian River Project therefore must be obtained from runoff originating in the portion of the Canadian River Basin between

terial Facts C.7, D.16. New Mexico points out that the States and the Master agree that nothing in Article IV would prevent New Mexico from simply enlarging Conchas Reservoir to capture all of the waters flowing into the river above Conchas Dam. See Tr. of Oral Arg. 6. That reading of the Compact is correct, but we fail to see how it refutes Texas' and Oklahoma's interpretation of the Compact. New Mexico apparently has never attempted to enlarge Conchas Reservoir because doing so is economically infeasible, and there is nothing in the evidence to suggest that the drafters contemplated that New Mexico would seek to enlarge Conchas Reservoir in the future. Instead, as noted above, the Compact drafters were operating on the assumption that New Mexico had fully developed its uses of water above Conchas Dam and would not need additional water for above Conchas uses. It does not necessarily follow that New Mexico's entitlement under Article IV(a) to all of the Canadian River water it can use from Conchas Reservoir gives New Mexico the unrestricted right to store that water at any point downstream from Conchas Dam. Any right New Mexico has to water spilling over Conchas Dam arises by virtue of Article IV(b), under which New Mexico may store for its use 200,000 acre-feet of water originating below Conchas Dam.[8]

---

Conchas Dam and Sanford Dam site . . . ." Plaintiffs' Exh. 101, p. 50. The 1954 report, as well as a 1960 Bureau Report, see Plaintiffs' Exh. 102, pp. 56, 58, make clear that the Bureau reads Article IV(b) as limiting New Mexico's storage of any water below Conchas Dam, including water which spills over Conchas Dam.

[8] An argument can be made that if the water originating below Conchas excludes any water coming out of or over Conchas, New Mexico is not entitled to store any such water, for Article IV(b) limits storage below Conchas Dam to those waters originating below that dam. Furthermore, the Hill memorandum, see n. 5, *supra*, indicates that the Commissioners negotiating the Compact anticipated that the storage permitted below Conchas would not be on the main stream but on the tributaries, and that 200,000 acre-feet would be sufficient to regulate those minor streams. See Plaintiffs' Exh. 38, p. 3. Obviously, under this reading of Article IV(b), Conchas spills would have to pass downstream to the Sanford project. Al-

It is worth noting the Special Master's observation that New Mexico's construction of Article IV, if accepted, would have a deleterious impact on the water supply to the Sanford project and hence would "run counter to the Congressional intention in conditioning funding of the Sanford Project on execution of the Compact and in subsequently approving the Compact." Report, at 57. Congress had been informed that the project would rely in part on water arriving in Texas in the mainstream of the Canadian. Yet New Mexico's version of the Compact would, as a practical matter, permit it to prevent any and all water entering the river above Conchas from ever reaching Texas, whether by enlarging Ute Reservoir or building additional facilities, and at the same time to impound at Ute Dam most if not all of the principal tributary inflow below Conchas.

All of New Mexico's needs for water above Conchas and for the Tucumcari project are fully satisfied. No one suggests otherwise. It is also plain that it was agreed in the Compact that 200,000 acre-feet of water storage would be adequate to satisfy New Mexico's needs for water below Conchas. That allocation was indeed generous. Since the signing of the Compact, there have been no developments in the area below Conchas which require substantial amounts of water for consumptive uses. According to the Special Master, slightly over 1,000 acre-feet for such purposes has been sold from Ute Dam since 1963. *Id.*, at 68. New Mexico is entitled to 200,000 acre-feet of conservation storage below Conchas Dam, which the Compact anticipated would take care of any future developments in the area below Conchas Dam. As we construe the Compact, if New Mexico has at any time stored more than that amount, it was not entitled to do so. Any water stored in excess of that amount should have been

---

though there are traces of these arguments in Texas' response to New Mexico's exceptions, Texas does not challenge New Mexico's entitlement to store Conchas spills in Ute Dam so long as the total storage in that reservoir does not exceed 200,000 acre-feet.

allowed to flow through the Ute Dam, to be put to use by the downstream States, rather than impounded in New Mexico.

Accordingly, we overrule New Mexico's exceptions to Part VII of the Report.[9]

## IV

In Part VIII of his Report, the Master recommended that this Court remand to the Canadian River Commission the question whether certain water stored in Ute Reservoir, water which New Mexico has designated a "desilting pool,"[10] is exempt from the Article IV(b) limitation on New Mexico's conservation storage because it allegedly serves a "sediment control" purpose within the meaning of Article II(d). Oklahoma and Texas except to this recommendation, arguing that there is sufficient evidence in the record to make a final determination on this issue, that the water in the desilting pool should be counted towards the Article IV(b) limitation, and that it is neither appropriate nor practical to refer the

[9] New Mexico also argues that the Master improperly shifted the burden of proof to New Mexico on the "above Conchas" issue, see Brief for New Mexico 26–28, but this exception does not merit discussion and is overruled.

[10] The lowest outlet works at Ute Reservoir are at an elevation of 3,725 feet. Below that elevation, no water in the reservoir can be released by natural gravity flow. This portion of a reservoir is customarily referred to as "dead storage" because its principal purpose is to serve as a depository for water-borne sediment entering the reservoir. The capacity of the dead storage pool at Ute Reservoir is approximately 20,700 acre-feet, almost half of which is actually occupied by sediment. Since 1962, the New Mexico Interstate Stream Commission, a state agency, has had an agreement with the New Mexico Game Commission to maintain the water in Ute Reservoir at a minimum elevation of 3,741.6 feet for recreational purposes. In 1984, New Mexico unilaterally designated this additional water (the water above dead storage, i. e., between elevation 3,725 and 3,741.6, approximately 49,900 acre-feet) a "desilting pool" which, according to New Mexico, is part of the overall "sediment control pool" at Ute Reservoir. Oklahoma and Texas oppose this designation and contend the water in the "desilting pool" must be counted toward the 200,000 acre-feet limitation in Article IV(b).

matter to the Commission. The Master acknowledged that the record developed in this case probably was sufficient to permit him to decide this issue, Report, at 99–100, but he declined to address it until after the States had first made some attempt, via the Canadian River Commission, to negotiate a settlement. We sustain Texas' and Oklahoma's exception to Part VIII of the Master's Report insofar as those States argue that the matter should not be referred to the Commission.

"Where the States themselves are before this Court for the determination of a controversy between them, neither can determine their rights *inter sese*, and this Court must pass upon every question essential to such a determination . . . ." *Kentucky* v. *Indiana*, 281 U. S. 163, 176–177 (1930). It is true that the Court has "often expressed [a] preference that, where possible, States settle their controversies by 'mutual accommodation and agreement,'" *Arizona* v. *California*, 373 U. S. 546, 564 (1963) (quoting *Colorado* v. *Kansas*, 320 U. S. 383, 392 (1943), and *Nebraska* v. *Wyoming*, 325 U. S. 589, 616 (1945)), but the Court "does have a serious responsibility to adjudicate cases where there are actual, existing controversies" between the States over the waters in interstate streams. 373 U. S., at 564. There is no doubt that such a dispute exists in this case, Oklahoma and Texas have properly invoked this Court's jurisdiction, and there is no claim that the "desilting pool" issue has not been properly presented. Thus, we see no legal basis for the Master refusing to decide the question and instead sending it to the Commission. Thus, we remand the "desilting pool" question to the Master for such further proceedings as may be necessary and a recommendation on the merits.[11]

---

[11] Likewise, we decline the Master's invitation to set forth prerequisites and guidelines, beyond those already in existence, for invoking this Court's original jurisdiction.

## V

The States' exceptions to the Special Master's Report are overruled except for Oklahoma's and Texas' challenge to the Master's recommendation that the "desilting pool" issue be referred to the Canadian River Commission, which is sustained in part.[12] The case is remanded to the Master for such further proceedings and recommendations as may be necessary.

*So ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR, JUSTICE SCALIA, and JUSTICE KENNEDY join, concurring in part and dissenting in part.

An interstate compact, though provided for in the Constitution, and ratified by Congress, is nonetheless essentially a contract between the signatory States. The Court's opin-

---

[12] The Special Master has submitted a suggested decree to be entered at this time, but we think it best to defer entry of any decree. First, in light of our remand for further proceedings with respect to the desilting pool issue, the decree will have to be revised in any event. Second, New Mexico has excepted to the proposed decree in certain respects, and it is not clear to us that the Master had the substance of these objections before him when he drafted his final Report. His views on those objections would be helpful. Third, paragraph 1 of the proposed decree provides that New Mexico shall have free and unrestricted use of the water of the Canadian River and its tributaries in New Mexico above Conchas Dam, such use to be made above or at Conchas, including diversions for use on the Tucumcari project. Report, at 112. Under this provision, New Mexico would not have unrestricted use of any water diverted at Conchas for downstream use other than at Tucumcari. Earlier in the Report, however, the Special Master states that he has concluded that New Mexico has unrestricted use of waters in the Canadian River basin above Conchas "if such waters are stored, used or diverted for use *at or above Conchas Dam,*" *id.,* at 59, including diversions at Conchas Dam for use on the downstream Tucumcari project. This conclusion, as stated, would not necessarily prevent diversions at Conchas for downstream use other than at Tucumcari, so long as such diversions did not involve downstream storage. In any event, we anticipate that the Special Master's subsequent report dealing with the desilting pool will include a revised draft of the proposed decree.

ion overruling New Mexico's objections to the Report of the Special Master varies the terms of a contract to which the States of Oklahoma, New Mexico, and Texas freely agreed. I do not believe it is within the Court's power to do this, and I therefore dissent from Part III of the Court's opinion, which restricts New Mexico's use of waters that spill over Conchas Dam. I concur in Parts I, II, and IV of the Court's opinion.

The Canadian River traverses three States. It originates in the high country of northern New Mexico, flowing southeast from there into the Texas Panhandle. New Mexico has erected two dams on the river, Conchas Dam and Ute Dam, which provide irrigation water for farming and municipal water for the city of Tucumcari, New Mexico. In Texas, the Sanford project diverts water to serve the municipal and industrial requirements of Texas cities throughout the Texas Panhandle region, from Amarillo to Lubbock. The river flows eastward from this project across the Texas Panhandle and into Oklahoma, and thence southeasterly throughout almost the entire State of Oklahoma until it joins the Arkansas River in the Eufala Reservoir a few miles west of Fort Smith, Arkansas.

In 1950, New Mexico, Texas, and Oklahoma convened to draft the Canadian River Compact (Compact), which apportioned the Canadian's waters in a manner that they hoped would serve New Mexico's and Texas' already substantial needs while anticipating the future needs of those States and Oklahoma. Article IV of the Compact, which governs the allocation of water to New Mexico, provides as follows:

"(a) New Mexico shall have free and unrestricted use of all waters originating in the drainage basin of Canadian River above Conchas Dam.

"(b) New Mexico shall have free and unrestricted use of all waters originating in the drainage basin of Canadian River in New Mexico below Conchas Dam, provided that the amount of conservation storage in New Mexico available for impounding these waters which originate in

the drainage basin of Canadian River below Conchas Dam shall be limited to an aggregate of two hundred thousand (200,000) acre-feet." 66 Stat. 75.

I part company with the majority's interpretation of this Article, based on my view that this provision means what it says. By its express terms, Article IV places *no* restrictions on New Mexico's use of waters originating above Conchas Dam. It imposes only two restrictions on its use of the waters originating in the drainage basin of the Canadian River *below* Conchas Dam: First, New Mexico's enjoyment of these lower-basin waters is restricted to waters located in New Mexico; second, New Mexico may allocate no more than 200,000 acre-feet of its total storage capacity for the conservation of these lower basin waters.

The Compact thus distinguishes between water "originating" in the lower basin and water "originating" at or above the upper basin. New Mexico enjoys free and unrestricted use of the latter. The ordinary understanding of what it means for waters to "originate" in a basin is that they "arise" or "com[e] into existence" in that location. See 10 Oxford English Dictionary 935–936 (2d ed. 1989). Thus, according to the plain meaning of Article IV(a), New Mexico may make unrestricted use of the Canadian River waters that arise above Conchas Dam. These waters may be stored, used, or diverted for use without limitation. Unlike the waters that enter the Canadian River below Conchas Dam, these waters may pass into the lower basin without being subject to the 200,000 acre-feet conservation storage restriction of Article IV(b).

Despite the clear import of the Compact's terms, the Court concludes that the Compact cannot mean what it says, and instead fashions a different allocation than that which is literally described. The Court concludes that "the intent of the Compact drafters was to give New Mexico free and unrestricted use of waters originating in the Canadian River drainage basin above Conchas Dam *only if* the waters were

'stored, used or diverted for use *at or above Conchas Dam.*'"
*Ante*, at 232 (quoting Report of Special Master 59) (emphasis
in original). The emphasized terms do not appear anywhere
in the Compact, and reflect not the intent of the parties, but
instead the intent that the Court now imputes to them. Al-
though the Compact grants New Mexico use of "all" waters
originating above Conchas Dam, the Court reads this to
mean "some": specifically excluding water that eventually
winds up below Conchas Dam. *Ante*, at 232–233. Accord-
ingly, the Court holds that *any* water found in the river
below Conchas, including spills and seepage from above Con-
chas Dam, is not subject to free and unrestricted use—even
though it clearly originated *above* Conchas Dam.

A compact is a contract among its parties. *Texas* v. *New
Mexico*, 482 U. S. 124, 128 (1987). Congressional consent el-
evates an interstate compact into a law of the United States,
yet it remains a contract which is subject to normal rules of
enforcement and construction. Thus, "unless the compact to
which Congress has consented is somehow unconstitutional,
no court may order relief inconsistent with its express
terms." *Texas* v. *New Mexico*, 462 U. S. 554, 564 (1983).
Accordingly, where the terms of the compact are unambigu-
ous, this Court must give effect to the express mandate of the
signatory States.

The Court asserts that we may rewrite the express terms
of Article IV(a) because of its understanding of the practical
consequences of faithfully applying that provision. *Ante*, at
230–232. The Court contends that, if taken at its word, the
Compact would permit New Mexico to lay claim to any water
originating above Conchas Dam, including tributaries that
arise in Colorado. The Court further asserts that a literal
interpretation would permit New Mexico to then chase this
water down and continue to claim access to it as it passes
down through Texas and Oklahoma. Based on its view that
the Compact could not have been drafted to produce the im-
plausible consequence that New Mexico could appropriate

Colorado's, Texas', and Oklahoma's waters, the Court abandons the literal text of the Compact and casts off in search of a new interpretation of the word "originating." *Ante,* at 232.

The Court's approach conjures up impractical consequences where none exist. The language of the Compact does not in any way support the notion that Colorado (a State that did not even participate in the Compact) might forfeit its waters to New Mexico. Colorado's rights are not implicated by the Compact at all. Although a small portion of the Canadian River's waters arise in Colorado, only New Mexico, Texas, and Oklahoma participated in the Compact and are parties to it. By its terms, the Compact allocates only those rights over the interstate waters of the Canadian River belonging to those three States. See Art. X. Thus, the Compact could not, and did not purport to, allocate Colorado's portion of the Canadian River. Any dispute between Colorado and the signatory States to this Compact must be resolved outside the terms of the Compact, and there is no reason to construe this Compact as though it purported to deal with Colorado's claims.

Similarly, Article V of the Compact dispels any concern that New Mexico's rights under a literal reading of Article IV(a) extend to waters originating above Conchas Dam that have left the State. That provision gives Texas "free and unrestricted use of all waters of [the] Canadian River in Texas," subject to certain storage limitations. The Compact gives New Mexico no rights to recapture errant water that reaches Texas because that water is then "in" Texas and therefore subject to Texas' rights under the Compact. The majority's failure to reconcile Article V with Article IV violates the ordinary rule of statutory and contract interpretation that all provisions of a Compact must be read together in a meaningful manner. See *United States* v. *Utah, Nevada & California Stage Co.,* 199 U. S. 414, 423 (1905).

Had the Compact's drafters intended to limit New Mexico's free and unrestricted use of the Canadian River waters originating above Conchas Dam in the manner announced today, they would certainly have done so more directly. For example, they might have drafted Article IV(a) to provide that "the amount of conservation storage in New Mexico below Conchas Dam shall be limited to an aggregate of 200,000 acre-feet." But they did not. Instead, they specifically agreed that only waters "which *originate* in the drainage basin of [the] Canadian River below Conchas Dam" were to be so restricted. The only reasonable conclusion to draw from this is that they intended the word "originating" to have some content.

The Court's free-form exploration of the practical consequences of the parties' agreement, and its reliance on evidence outside of the Compact to introduce ambiguity into Compact terms, is both contrary to our precedents and unfair to the parties. When parties to a contract have expressed their intent on a matter in unambiguous terms, we should not substitute our will for their purpose. *Texas* v. *New Mexico*, *supra*, at 564. The parties made an agreement, and have acted in reliance upon the terms of that contract and settled principles of contract law. The contract law principles of all three States disallow recourse to evidence outside the record under these circumstances. In those jurisdictions, where the language of an agreement clearly expresses the intent of the parties, courts may not rely on extrinsic evidence to vary its terms. See, *e. g.*, *Mercury Investment Co.* v. *F. W. Woolworth Co.*, 706 P. 2d 523, 529 (Okla. 1985); *Hobbs Trailers* v. *J. T. Arnett Grain Co.*, 560 S. W. 2d 85, 87 (Tex. 1977); *Trujillo* v. *CS Cattle Co.*, 109 N. M. 705, 709–710, 790 P. 2d 502, 506–507 (1990). Even viewed as a federal statute, the Court's treatment of the Compact's plain language is improper. Congress gave its blessing to this Compact and, in doing so, codified the agreement as federal law. As we stated in *Arizona* v. *California*, 373 U. S. 546, 565–566

(1963): "Where Congress has . . . exercised its constitutional power over waters, courts have no power to substitute their own notions of an 'equitable apportionment' for the apportionment chosen by Congress."

Even if I agreed with the Court that it is appropriate in this case to look outside the Compact to determine the meaning of Article IV(a), I would not agree with its conclusion that the parties intended to include overflow waters from the upper basin of Conchas Dam within the term "waters which originate in the drainage basin of Canadian River below Conchas Dam." I do not find either piece of evidence relied upon by the Court to be supportive of that position, let alone persuasive.

The Court says that the Compact negotiators did not place any limitation on the amount of storage of waters originating above Conchas Dam because they believed that those waters were already being fully used. Accordingly, the Court reasons, the negotiators assumed that any future development of the river's waters in New Mexico would necessarily occur only below Conchas Dam, and that 200,000 acre-feet of storage rights would be more than sufficient to satisfy those development needs. *Ante,* at 236. The Court concludes that "these circumstances," demonstrate that Texas and Oklahoma could not have intended to permit New Mexico to impound any more than the 200,000 acre-feet of water for conservation storage purposes below Conchas Dam. *Ante,* at 237.

As a preliminary matter, the record simply does not bear out the Court's view. The only evidence that directly addresses the issue establishes that the 200,000 acre-feet limitation was derived solely from New Mexico's perceived requirements for Canadian River waters *originating* in the lower basin. The "Hill memorandum," authored by Raymond Hill, Chairman of the Engineering Advisory Committee, and approved by the Compact Commission at its final meeting on January 31, 1951, stated that the storage limita-

tion was directed only towards impoundment of "the flood flows of Ute Creek and other minor tributaries of Canadian River *entering the stream below Conchas Dam* and above any contemplated storage works on Canadian River in Texas." Plaintiff's Exh. 38, p. 3 (emphasis added). The storage limits thus appear to have been directed at waters entering New Mexico below Conchas Dam but before the river enters Texas. Indeed, a letter from New Mexico's Commissioner, John Bliss, to Senator Anderson of New Mexico, written the day after the Compact was signed, expressly noted that the 200,000 acre-feet limitation did *not* apply to spills. Plaintiff's Exh. 28. By contrast, there is no direct support whatsoever for the Court's statement that the Compact's 200,000 acre-feet limitation on lower basin waters was intended to apply to upper basin waters captured in the lower basin.

Even assuming that the Court's view of the facts is correct, I do not see how these facts support its conclusion. The Court observes that at the time of the Compact, New Mexico had fully developed reliable supplies of water above Conchas Reservoir, and thus there would be no purpose in placing a limitation upon any increase in the amount of storage of *those* waters. The Engineering Advisory Committee determined that "above Conchas, the available water supply has all been put to use—any further development above Conchas would deplete the supply available for Tucumcari Project; thus future developments would emphasize the better utilization of existing supplies." Plaintiff's Exh. 109, p. 1. This assessment, on its face, refers to the usage of normal water flows and not to the specific issue raised in this case, overflows and spills. In asserting that further development of the upper basin would draw on Tucumcari project waters, the engineer advisers did not contemplate spill waters or return flows from Tucumcari. As the Special Master himself concluded: "The *most* that can be said about the Engineer Advisors' treatment of Conchas spills is that they apparently did not

project that they would recur with the frequency and magnitude that they subsequently have." Report of Special Master 67 (emphasis added).

The Court also relies on the fact that a 1960 study by the Bureau of Reclamation included outflows from Conchas Dam in estimating water supply to Sanford Reservoir, Texas. See Plaintiff's Exh. 102, pp. 64, 67, 70–71. This too has no bearing on the intent of the parties to this Compact, or the meaning of Article IV. The Bureau published the final draft of its report nearly a decade after the Compact was signed. The Bureau's report simply acknowledges that in light of the massive spills over Conchas Dam that occurred in 1941 and 1942, it might be reasonable to assume that occasional spills might contribute to the Sanford project's water supply. This conclusion does not favor one view or another about New Mexico's right to capture some of the overflow from Conchas Dam, since it is clear that New Mexico was physically incapable of capturing all of the overflow from the massive floods that have occurred twice this century. The Bureau's estimates merely reflect reality; they do not suggest that the Compact requires waters flowing from Conchas spills to serve the Sanford project alone.

Finally, putting aside the Court's dismissive treatment of the Compact terms and the parties' expectations, today's decision makes little practical sense. The Court's decision will not protect the rights of the downstream States, except to the extent that it will force New Mexico to behave inefficiently in using its water. Oklahoma and Texas do not dispute that New Mexico could, if it desired, enlarge the reservoir behind Conchas Dam to capture all of the Canadian River's waters and dry up the river beds of the downstream States. Tr. of Oral Arg. 29, 33–34; *ante*, at 238. The Court also acknowledges that the Compact gives New Mexico the included right to capture additional waters at or above Conchas and then divert them to downstream locations. See *ante*, at 242, n. 12. The Court's construction, therefore, does

not prevent New Mexico from capturing flood waters and diverting them to projects below Conchas Dam; it merely forces the State to take its rightful waters by means of costly, inefficient, and wasteful engineering.

The Canadian is an unpredictable river: For the first 36 years of the Compact it lay dormant before it boiled over Conchas Dam, spilling several hundred thousand acre-feet of water into the lower basin. The Compact allocated this water. New Mexico was entitled to keep as much as it wished in modest storage facilities to recapture its upper basin waters. All the rest would naturally flow down to Texas and Oklahoma. The Court today rewrites that simple allocation. While rivers such as the Canadian may be unpredictable, interpretation of contracts involving those rivers should not be. The Court frustrates settled expectations by rewriting the Compact to mean something other than what its language says. Accordingly, I dissent from Part III of the Court's decision.