# Construction of State Reporting Requirements in Section 404 of the Personal Responsibility and Work Opportunity Reconciliation Act

The better interpretation of the state reporting requirements in section 404 of the Personal Responsibility and Work Opportunity Reconciliation Act is that they apply only to those state agencies administering the particular federally funded program in question, not to all state agencies in a State that receives funds under the program

August 18, 1998

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
IMMIGRATION AND NATURALIZATION SERVICE

Your Office has sought our views on the interpretation of section 404 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104–193, 110 Stat. 2105, 2267 (1996).[1] In general, covered "States" are required to report to the Immigration and Naturalization Service ("INS") identifying information concerning illegal aliens who receive benefits under the programs covered by the section. You have asked whether the administering federal agencies may adopt a "narrow" construction, rather than a "broad" one, of the meaning of the term "State" within the reporting requirement of the section. We conclude that the "narrow" construction is the better interpretation and should be adopted.

In general, section 404 of PRWORA, which is entitled "Notification and Information Reporting," requires state and federal agencies implementing certain federal benefits programs to report to the INS identifying information concerning aliens whom they know to be illegally in the United States. Subsection 404(b) imposes such reporting requirements on States receiving grants for the Temporary Assistance for Needy Families ("TANF") program, the successor to the Aid to Families With Dependent Children ("AFDC") program.[2] Subsection 404(c) requires such reporting from the Commissioner of the Social Security Administra-

---

[1] See Memorandum for Christopher Schroeder, Acting Assistant Attorney General, Office of Legal Counsel, from David A Martin, General Counsel, Immigration and Naturalization Service, Re: Interpretation of Section 404 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub L No. 104–193 (Dec 31, 1996) (attaching Memorandum to Welfare Reform Task Force from Reporting/Tracking Working Group, Re: Scope of State Reporting Requirements Under Section 404 of the Welfare Act (Dec 31, 1996) ("Working Group Memorandum")).

[2] Specifically, subsection 404(b) amends Part IV–A of the Social Security Act of 1935, ch 531, 49 Stat. 620, 627 (1935) (codified as amended at 42 U S.C. §§ 601–619 (1994 & Supp III 1997), by adding a new section 411A, to read as follows:

**Sec. 411A. State Required To Provide Certain Information**

Each State to which a grant is made under section 403 shall, at least 4 times annually and upon request of the Immigration and Naturalization Service, furnish the Immigration and Naturalization Service with the name and address of, and other identifying information on, any individual who the State knows is unlawfully in the United States

tion ("SSA") in connection with the Supplemental Security Income ("SSI") program; of more relevance here, subsection (c) also requires the SSA, when making SSI agreements with the states, to "ensure that each [such] agreement . . . provides that the State shall furnish such information . . . with respect to any individual who the State knows is unlawfully in the United States." Subsection (d) requires such reporting from the Secretary of Housing and Urban Development ("HUD") in connection with certain federally funded housing assistance programs; in addition, it requires HUD to include, in certain housing contracts with any "public housing agency," that such agency shall furnish such information.

The Working Group established to consider the legal and administrative consequences of PRWORA has considered two rival interpretations of the scope of section 404's reporting requirements, with particular regard to the state reporting requirements in subsections (b) and (c).[3] On the "broad" view, the section requires states that receive TANF grants (or that enter into SSI contracts) to report information regarding aliens known *by any state agency* to be in the United States illegally.[4] On the "narrow" view, the reporting requirement is limited only *to those state agencies administering the particular federally funded program in question* (i.e., TANF in the case of subsection (b), SSI in the case of subsection (c)). The Working Group, with the concurrence of the Department of Health and Human Services,[5] concludes that section 404 should be interpreted narrowly, i.e., that only the particular state agencies that themselves administer the federal programs covered by the provision are required to report the presence of aliens whom they know to be in the United States illegally.

## I.

In deciding between the two interpretations, we must, of course, begin with " 'the language [of the statute] itself.' " *Ardestani v. INS*, 502 U.S. 129, 135 (1991) (citation omitted). Although the Working Group finds that "[i]ntuitively, the term 'State' would seem to comprehend any of the state's subordinate entities," it nonetheless concludes that there is "some ambiguity in the statute," Working Group Memorandum at 2. We agree.

To begin with, we think that ambiguity is built into a term as general and protean as "State." "[T]he word 'state' . . . can contain many meanings." *National*

---

[3] Because the relevant reporting requirement in subsection (d) relates to "public housing agencies," not to "States," it does not pose any comparable interpretative problem.

[4] States that participate in certain other federal programs must collect information regarding immigration status. *See* 42 U.S.C § 1320b-7(d)(1)(A) (1994) (requiring state income and eligibility verification systems to include information "stating whether the individual [beneficiary] is a citizen or national of the United States, and, if that individual is not a citizen or national of the United States, that the individual is in a satisfactory immigration status") This information-gathering requirement pertains to the programs enumerated in § 1320b-7(b), including the medicaid, unemployment compensation, and the food stamp programs. In the course of gathering the covered information, a State may discover that an individual is not lawfully present in the United States.

[5] Letter for Randolph Moss, Deputy Assistant Attorney General, Office of Legal Counsel, from Harriet S Rabb, General Counsel, Department of Health and Human Services (Feb. 18, 1997)

*Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 587 (1949) (opinion of Jackson, J.).[6] To be sure, the term "State" often includes state agencies other than the particular agency that administers the program most relevant to the statute in which the term appears.[7] But our Office has also opined that the term "State" may be construed in light of the "overall legislative objective" of the statute in which it appears.[8] The construction of the term "State" will therefore often require "not only . . . consideration of the word[ ] [itself], but . . . as well, the context, the purposes of the law, and the circumstances under which the word[ ] [was] employed." *Puerto Rico v. Shell Co. (P.R.)*, 302 U.S. at 258.

Such considerations of context, structure and purpose confirm that the broad interpretation of "State" in subsections 404(b) and (c) is open to question. For example, a broad reading of subsection (b) would make the other reporting mandates in section 404 redundant. Although state participation in the TANF program (like state participation in the former AFDC program) is in a strict sense "voluntary," [9] all the States, as a practical matter, can be expected to participate in TANF. It would follow, under the broad view, that "every state agency in the United States discovering an alien to be in the country unlawfully would have to furnish identifying information to the Service pursuant to subsection (b)." Working Group Memorandum at 4. However, subsection 404(c) separately provides for such reporting by state agencies under contracts relating to the SSI program; and subsection 404(d) requires public housing agencies—which might be counted as "state" agencies—to furnish such information under their contracts with HUD. The broad reading would seem to make these reporting requirements superfluous.

Moreover, PRWORA attaches reporting requirements to some federal programs administered by the states, but not to others. Thus, while section 404 attaches reporting requirements to state receipt of funds under the TANF, SSI and HUD programs, it does not attach them to funding under the Food Stamps or child care programs. These textual differences in the reporting obligations of the various state grantees "suggest that Congress intended to require reporting only by state

---

[6] *See also id.* at 623 (Rutledge, J., concurring) ("Key words like 'state,' 'citizen,' and 'person' do not always and invariably mean the same thing "). Similar ambiguities lurk in general terms such as "territory," *Puerto Rico v Shell Co. (P R )*, 302 U.S. 253, 258 (1937), and "possession," *Vermilya-Brown Co v. Connell*, 335 U S 377, 386 (1948). *See also District of Columbia v. Carter*, 409 U S. 418, 420 (1973) ("Whether the District of Columbia constitutes a 'State or Territory' within the meaning of any particular statutory or constitutional provision depends upon the character and aim of the specific provision involved "); *Romero v United States*, 38 F.3d 1204, 1208 (Fed. Cir. 1994) ("[T]he plain language of the statute does not immediately tell us whether Puerto Rico may be considered a 'State or territory or possession' within 5 U S.C § 5517".).

[7] *See National Bureau of Standards—Services to State Institutions*, 24 Op. Att'y Gen. 667, 671 (1903) (term "State governments" within meaning of statute entitling such entities to free services of National Bureau of Standards did not refer only to department having custody of state standards, but also to other agencies "performing and discharging well-recognized functions of the State government," such as state universities)

[8] *Recovery of Interest on Advance Payments to State Grantees and Subgrantees*, 6 Op O.L.C 127, 132 (1982).

[9] *See Batterton v. Francis*, 432 U S. 416, 420 (1977) (AFDC program is a "cooperative venture[ ] of the Federal Government and the States"); *Rosado v Wyman*, 397 U S 397, 408 (1970) (state participation in AFDC program "is basically voluntary").

agencies implementing the specific programs referred to in section 404." Working Group Memorandum at 3.

Furthermore, section 434 of PRWORA, 110 Stat. at 2275, authorizes state and local governments, "[n]otwithstanding any other provision of Federal, State, or local law," to report information regarding an alien's immigration status, "lawful or unlawful," to the INS. On the broad reading, this provision also seems largely redundant. Congress would not have *permitted* the states under section 434 to report the immigration status of illegal aliens if, under section 404, it was effectively *mandating* that they report such information.

Finally, the Court has held that "Congress, when exercising its spending power, can impose no burden upon the States unless it does so unambiguously." *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 190 n.11 (1982). Here, a "broad" reading of the section would impose an extraordinary new obligation on the States, cutting across a range of state programs from drivers' licenses to the public schools. We think that if Congress had genuinely intended *all* state agencies, as opposed to the *administering* state agencies, to be subject to the reporting requirements of section 404, it could, and would, have made its intention more explicit.

Against these arguments, it might be said that the term "State" appears twice in subsection 404(b); that under normal rules of statutory construction it must therefore have a unitary meaning; that in its first occurrence—"State to which a grant is made under section 403"—it plainly refers to a "State" in the broad sense; and that the second occurrence of the term—"individual who the state knows is unlawfully in the United States"—must therefore have the same broad meaning. Even assuming, *arguendo*, that the term "state" is first used in the broad sense, we do not accept the suggested conclusion. While it is "the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning," *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (citations and internal quotation marks omitted),[10] that "presumption is defeasible." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 292 (1993) (Souter, J., concurring in the judgment in part and dissenting in part).[11] Here, the presumption conflicts with other normal rules of construction, including the presumption that Congress does not legislate uselessly, and that all parts of

---

[10] *See also Gustafson v Alloyd Co*, 513 U S 561, 568, 573 (1995), *National Mut Ins Co v. Tidewater Transfer Co*, 337 U S at 587 (opinion of Jackson, J) ("While the word ['state'] is one which can contain many meanings, such inconsistency in a single instrument is to be implied only where the context clearly requires it "); *BFP v. Resolution Trust Corp*, 511 U.S 531, 557 (1994) (Souter, J, dissenting)

[11] *See also Helvering v Stockholms Enskilda Bank*, 293 U.S 84, 86–87 (1934), *Morse v Republican Party of Va*, 517 U S 186, 247 n.4 (1996) (Scalia, J, dissenting) So, for example, in *United States v Sheffield Bd of Comm'rs*, 435 U.S 110, 127 (1978), the Court noted that "the term 'State' does not have this [unitary] meaning throughout the [Voting Rights] Act " More recently, the Court declined to read the term "allowed secured claim" in one subsection of the Bankruptcy Code, 11 U.S.C § 506(d), as "an indivisible term of art defined by reference" to subsection (a) of the same provision *See Dewsnup v Timm*, 502 U S. 410, 415 (1992), *id* at 422 (Scalia, J, dissenting)

a statute should be given effect if possible.[12] Hence, the second occurrence of the term "state" in subsection 404(b) may have a narrower meaning than it bears in its first occurrence.

It might also be argued that the relevant occurrence of "State" in subsection 404(b) is unambiguous because the term "State" is *defined* under PRWORA's amendments for Part IV–A of the Social Security Act (where subsection 404(b) is to appear as section 411A). That definition is set forth in subsection 103(a) of PRWORA (to become in relevant part section 419(5) of the Social Security Act). 110 Stat. at 2160. The definition states that, "[e]xcept as otherwise specifically provided, the term 'State' means the 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, and American Samoa." *Id*. Arguably, this definition establishes two things: first, that the term "State" must be given a single, unitary meaning throughout Part IV–A, unless the statute itself specifies otherwise; second, that the term "State" has a referent broader than the TANF-administering state agencies.

We attribute a different purpose to the definition. But for the definitional references to the District of Columbia, Puerto Rico, the Virgin Islands, Guam and American Samoa, Part IV–A might not be held to apply to those entities.[13] The definition thus does not tell for or against either the broad or the narrow interpretation of "State." It signifies merely that, whether "state" includes all subordinate state agencies or only those that administer TANF, the same is to be true with respect to the District of Columbia (and the other non-"state" governments).

Accordingly, we believe that there is sufficient ambiguity in section 404's use of the term "State" to justify recourse to the provision's legislative history. We consider that history below.

## II.

We believe that the language of the Conference Report on PRWORA, as well as that of the House and Senate Reports, supports the narrower interpretation. The Conference Report reads in relevant part as follows (H.R. Conf. Rep. No. 104–725, at 382 (1996), 1996 U.S.C.C.A.N. 2183, 2770):

*House bill*

. . .

---

[12] *See Mackey v Lanier Collection Agency & Serv.*, 486 U S 825, 837 & n 11 (1988), *Fidelity Fed Sav. & Loan Ass'n v de la Cuesta*, 458 U S. 141, 163 (1982); *Reiter v. Sonotone Corp* , 442 U S 330, 339 (1979)

[13] *See National Mut Ins. Co. v. Tidewater Transfer Co.*, 337 U S 582 (1949) a 1940 amendment to the Judiciary Act of 1789, which authorized federal courts to entertain diversity suits between citizens of states and citizens of the District of Columbia, the latter class of citizens could not have been parties to such actions, since the District of Columbia was not a "state" under pre-1940 statute), *cf. EEOC v Arabian Am Oil Co* , 499 U.S 244, 254 (1991) (noting the argument that the alien exemption provision of Title VII of Civil Rights Act, which makes the statute inapplicable to employment of aliens "outside any State," was intended to ensure that aliens in United States *possessions* were not protected by Act)

Agencies that administer SSI, housing assistance programs under the United States Housing Act of 1937, or block grants for temporary assistance for needy families (the successor program to AFDC) are required to furnish information about aliens they know to be unlawfully in the United States to the Immigration and Naturalization Service (INS) at least four times annually and upon INS request.

*Senate amendment*

Similar to House bill.

*Conference agreement*

The conference agreement follows the House bill and the Senate amendment.

The House Report adds, as a reason for the change in the law, that ''[a]s public benefits are a magnet for illegal aliens to come to and stay in the U.S., welfare agencies should assist INS in its mandate to identify and remove illegal aliens from the country.'' H.R. Rep. No. 104–651, at 1445 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183, 2770. The Senate Committee Print also includes this sentence. Staff of Senate Comm. on the Budget, 104th Cong., Committee Recommendations as Submitted to the Budget Committee on the Budget Pursuant to H.R. Con. Res. 178, at 219 (Comm. Print 1996).

In light of these statements, we concur that ''the legislative history supports the narrow view.'' Working Group Memorandum at 5.

## III.

We conclude that the ''narrow'' interpretation of the scope of section 404 is the better view of the section, and therefore that the various federal agencies administering the grants and contracts covered by section 404 should adopt that interpretation. Having found that the statutory text is ambiguous, we ''appropriately may refer to [the] statute's legislative history to resolve [any] ambiguity.'' *Toibb v. Radloff*, 501 U.S. 157, 162 (1991); *see also Oklahoma v. New Mexico*, 501 U.S. 221, 237 (1991). As discussed above, the legislative history clearly supports the ''narrow'' construction.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*