# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STANMORE CAWTHON COOPER,
              *Plaintiff-Appellant,*

                v.

FEDERAL AVIATION ADMINISTRATION;
SOCIAL SECURITY ADMINISTRATION;
UNITED STATES DEPARTMENT OF
TRANSPORTATION,
              *Defendants-Appellees.*

No. 08-17074

D.C. No.
3:07-cv-01383-
VRW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Vaughn R. Walker, Chief District Judge, Presiding

Argued and Submitted
January 13, 2010—San Francisco, California

Filed February 22, 2010
Amended September 16, 2010

Before: Myron H. Bright,* Michael Daly Hawkins, and
Milan D. Smith, Jr., Circuit Judges.

Order;
Concurrence to Order by Judge M. Smith;
Dissent to Order by Judge O'Scannlain;
Opinion by Judge Milan D. Smith, Jr.

---

*The Honorable Myron H. Bright, Senior United States Circuit Judge
for the Eighth Circuit, sitting by designation.

14239

## COUNSEL

Raymond A. Cardozo, Tiffany Renee Thomas, James M. Wood, and David J. Bird, Reed Smith LLP, for plaintiff-appellant Stanmore Cawthon Cooper.

Michael F. Hertz, Joseph P. Russoniello, Mark B. Stern, and Samantha Chaifetz, for defendants-appellees, Federal Aviation Administration, Social Security Administration, and United States Department of Transportation.

## ORDER

The opinion filed February 22, 2010, and published at 596 F.3d 538, is hereby amended by deleting footnote 2 (and renumbering succeeding footnotes) on pages 2825-26 of the slip opinion (also found at 596 F.3d 538, 543-44).

With this amendment, the panel votes to deny the petition for panel rehearing. Judge M. Smith votes to deny the petition for rehearing en banc, and Judges Bright and Hawkins so recommend.

The full court was advised of the petition for rehearing en banc. After a request for a vote by an active judge, a vote was taken, and a majority of the active judges of the court failed to vote for a rehearing en banc. Fed. R. App. P. 35(f).

The petitions for panel rehearing and rehearing en banc are DENIED. Further petitions for rehearing and rehearing en banc shall not be entertained.

---

M. SMITH, Circuit Judge, concurring in the order denying rehearing en banc:

I write to respond briefly to the dissent filed with this order.

The Privacy Act (Act) unequivocally waives sovereign immunity. Under the Act, if a "court determines that [an] agency acted in a manner which was intentional or willful, the United States *shall be liable* to the individual in an amount equal to the sum of . . . *actual damages* sustained by the individual as a result of the refusal or failure" to comply with the Privacy Act. 5 U.S.C. § 552a(g)(4) (emphases added). In light of that unconditional waiver, we appropriately followed Justice Cardozo's admonition: " 'The exemption of the sovereign from suit involves hardship enough, where consent has been withheld. We are not to add to its rigor by refinement of construction, where consent has been announced.' " *United States v. Aetna Surety Co.*, 338 U.S. 366, 383 (1949) (quoting *Anderson v. Hayes Constr. Co.*, 153 N.E. 28, 29-30 (N.Y. 1926)).

Our dissenting colleague mistakenly asserts that our opinion waives the sovereign immunity of the United States. In fact, Congress did so. Thus, the issue in this case is not the *existence* of a waiver, but rather the *scope* of that express waiver, as contemplated in the Act. To that end, we correctly

construed the waiver to allow the recovery of nonpecuniary damages, based upon clear congressional intent.

I

The sovereign immunity canon requires that governmental waivers of sovereign immunity be "unequivocally expressed." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34 (1992) (internal quotation marks omitted). The canon has clearly been satisfied in this case. The Act categorically waives the federal government's immunity from suit and indisputably authorizes the recovery of "actual damages." The government's surrender to liability for damages is in the plain text of the Act itself, leaving us only to construe the scope of that surrender.

To construe the scope of this waiver, the panel followed controlling precedent directing the panel to look to the policies or objectives underlying the Act. *See, e.g.*, *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990) (construing the scope of a wavier of sovereign immunity that reflects "a realistic assessment of legislative intent"); *Franchise Tax Bd. of Cal. v. Postal Serv.*, 467 U.S. 512, 514-16, 521 (1984) (rejecting the government's narrow construction of the scope of the waiver of sovereign immunity under 39 U.S.C. § 401 and holding that "the scope of such a waiver can only be ascertained by reference to underlying congressional policy"); *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 921-22 (9th Cir. 1995) (holding that a narrow construction of sovereign immunity under the Navajo-Hopi Settlement Act was improper in light of "the overriding congressional purpose behind the Settlement Act"); *United States v. Oregon*, 44 F.3d 758, 766 (9th Cir. 1994) ("The Supreme Court has repeatedly looked to indicia of Congressional intent in order to construe the scope of the unequivocally expressed waiver of immunity in the McCarran Amendment."); *In re Town & Country Home Nursing Servs., Inc.*, 963 F.2d 1146, 1151 (9th Cir. 1991) ("It is well established that when the federal government waives its

immunity, the scope of the waiver is construed to achieve its remedial purpose.").

## II

The dissent wrongly concludes that the court's observation that the term "actual damages," standing alone, is ambiguous necessarily means that the Act does not waive sovereign immunity for nonpecuniary damages. Our jurisprudence has clarified that "[r]ather than focusing just on the word or phrase at issue, this court looks to the entire statute to determine Congressional intent." *Sanchez v. Pac. Powder Co.*, 147 F.3d 1097, 1099 (9th Cir. 1998). "Thus, the structure and purpose of a statute may also provide guidance in determining the plain meaning of its provisions." *The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003) (en banc).

Accordingly, we looked to several sources manifesting the Act's overall objective. We noted the Act's preambular statement of purpose, wherein Congress stated that "[t]he purpose of this act is to provide certain safeguards for an individual against an invasion of personal privacy by requiring federal agencies . . . to . . . be subject to civil suit for *any damages* which occur as a result of willful or intentional action which violates any individual's rights under this Act." Pub. L. No. 93-579, § 2(b)(6) (emphasis added). We highlighted the Act's requirement that agencies maintain records "to protect against any anticipated threats or hazards . . . which could result in . . . embarrassment." 5 U.S.C. § 552a(e)(10). We also observed the Act provides a remedy for an agency's violation that inhibits a fair determination relating to one's "character." § 552a(g)(1)(C). Such sources provided helpful guidance in discerning Congress's remedial aim in enacting the Act.

Understanding that "statutory language cannot be construed in a vacuum," *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989), the panel construed the term "actual dam-

ages" in its proper context, *see id.*, to conclude that it unequivocally encompasses nonpecuniary damages. When a statute is ambiguous, the doctrine of sovereign immunity is useful as "a tool for interpreting the law." *Richlin Sec. Serv. Co. v. Chertoff*, 128 S. Ct. 2007, 2019 (2008). When a statute is not ambiguous, however, "[t]here is no need for us to resort to the sovereign immunity canon." *Id.* Because "there [was] no ambiguity left for us to construe," *id.*, the application of the sovereign immunity canon was unnecessary in this case.

Further, "[t]he sovereign immunity canon is just that—a canon of construction. It is a tool for interpreting the law, and we have never held that it displaces the other traditional tools of statutory construction." *Id.*; *see also Clark v. Martinez*, 543 U.S. 371, 382 (2005) ("The canon is thus a means of giving effect to congressional intent, not of subverting it."); *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (noting that "canons are not mandatory rules" but guides "designed to help judges determine the Legislature's intent," and that "other circumstances evidencing congressional intent can overcome their force"). Based upon the clear congressional intent as to the scope of "actual damages" under the Privacy Act, this court properly concluded that the government could not "carry the day by invoking general maxims of judicial policy." *Town & Country*, 963 F.2d at 1152.

## III

The dissent misconstrues the relationship between the requirement of showing an "adverse effect" and that of "actual damages." In *Doe v. Chao*, the Court held that "an individual subjected to an adverse effect has injury enough to open the courthouse door." 540 U.S. 614, 524-25 (2004). A majority of the circuits in this country, including our own, has held that mental distress or emotional harm is sufficient to constitute an adverse effect. *See, e.g.*, *Englerius v. Veterans Admin.*, 837 F.2d 895, 897 (9th Cir. 1988).

Under the dissent's view, a plaintiff is entitled to establish standing for an injury under the Act that results in a nonpecuniary harm, but is not entitled to seek actual damages for such a nonpecuniary injury. Such a construction of the Act would clearly frustrate the intent of Congress. In contrast, our opinion is true to the overall objective of the Act, allowing a plaintiff who demonstrates a nonpecuniary adverse effect to have the opportunity to recover nonpecuniary damages, to the extent the plaintiff can proffer the requisite degree of competent evidence that there is a real and tangible nonpecuniary injury. Our opinion is also consistent with the familiar rule of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. *See, e.g.*, *Clark v. Capital Credit & Collection Servs, Inc*., 460 F.3d 1162, 1176 (9th Cir. 2006) (concluding the remedial nature of the Fair Debt Collection Practices Act required a liberal construction); *Stewart Title Guar. Co. v. Park*, 250 F.3d 124, 1252 (9th Cir. 2001) ("The purpose of the statute is remedial, and, therefore, should be given a liberal construction[.]"); *see also Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (characterizing the Privacy Act as "a comprehensive remedial scheme").

IV

Controlling precedent in cases such as *Franchise Tax Board*, *Hopi Tribe*, and *Town & Country*, requires us to construe the scope of the Act's unequivocal waiver of sovereign immunity in light of the underlying congressional policy, and with the purpose of achieving the remedial goal of that waiver. The multiple sources the panel consulted reveal a clear and focused intent on the part of Congress to grant complete relief to those injured by willful violations of the Act. Given that intent, Congress's provision that the federal government be liable for "actual damages" constitutes an unequivocal expression of the federal government's waiver of its own sovereign immunity for nonpecuniary injuries. The panel concluded there was no other plausible explanation for this unqualified language.

In conclusion, our dissenting colleague reminds us that "[o]nly Congress has the keys to unlock our country's Treasury." Dissent at 14253-54. But Congress used its keys and opened that door for plaintiffs injured by willful violations of the Act when it expressly gave plaintiffs the right to sue the government for actual damages. A court must not act "as a self-constituted guardian of the Treasury [to] import immunity back into a statute designed to limit it." *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955).[1]

## V

The panel's decision is compelled by the precedents of the Supreme Court and this court for construing the scope of a waiver of sovereign immunity, and the court properly denied rehearing this case en banc.

O'SCANNLAIN, Circuit Judge, dissenting from the order denying rehearing en banc, joined by KOZINSKI, Chief Judge, and GOULD, TALLMAN, BYBEE, CALLAHAN, BEA, and N.R. SMITH, Circuit Judges:

The Supreme Court has consistently held that the sovereign immunity of the United States may be waived only by an unequivocal expression in statutory text. *Lane v. Pena*, 518 U.S. 187, 192 (1996). Today, our court neglects this principle by leaving in place a decision that the term "actual damages" in the Privacy Act, 5 U.S.C. § 552a(g)(4)(A), is sufficient to deem sovereign immunity waived for nonpecuniary damages,

---

[1] Our opinion will not "saddle the Government with disproportionate liability," *Doe*, 540 U.S. at 637 (Ginsburg, J., dissenting), as the dissent suggests. Our opinion does not relieve the plaintiff of his burden of producing evidence sufficient for a jury to find that the emotional harm he claims to have suffered was tangible and severe enough to give rise to actual damages. It simply gives the plaintiff his day in court so he can present competent evidence of his injury.

even though the opinion itself admits that the term is not defined in the statute, has no plain meaning, has no fixed legal meaning, and indeed, is a "chameleon." *Cooper v. FAA*, 596 F.3d 538, 544-45 (9th Cir. 2010). Even more troubling, the opinion relies on abstract legislative intent and an interpretation of the Privacy Act that the Supreme Court recently rejected in *Doe v. Chao*, 540 U.S. 614 (2004). The effect of today's order is to open wide the United States Treasury to a whole new class of claims without warrant. In so doing, we exacerbate a circuit split that had been healing under the strong medicine of recent sovereign immunity jurisprudence.[1] Hence, it is most unfortunate that we did not rehear this case en banc.

I

"A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied. Moreover, a waiver of the Government's sovereign immunity will be strictly construed, *in terms of its scope*, in favor of the sovereign." *Lane*, 518 U.S. at 192 (emphasis added) (internal citations omitted).[2] "[T]he 'unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in statutory text."

---

[1]*Compare Hudson v. Reno*, 130 F.3d 1193, 1207 & n.11 (6th Cir. 1997) (holding Privacy Act does not waive sovereign immunity for nonpecuniary damages), *and Fanin v. Dep't of Veterans Affairs*, 572 F.3d 868, 872-75 (11th Cir. 2009) (following *Fitzpatrick v. IRS*, 665 F.2d 327, 329-31 (11th Cir. 1982)) (same), *with Johnson v. IRS*, 700 F.2d 971, 974-86 (5th Cir. 1983) (holding Privacy Act waives sovereign immunity for nonpecuniary damages), *and Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) (reluctantly following *Johnson* despite subsequent sovereign immunity jurisprudence).

[2]My colleague's concurrence in the denial of rehearing en banc agrees that the relevant issue is not the existence of a waiver, but the *scope* of the waiver. *See* Concurrence at 14244. However, since the meaning of the term "actual damages" is ambiguous, the court should have construed the waiver narrowly in "favor of the sovereign." *Lane*, 518 U.S. at 192.

*United States v. Nordic Village, Inc.*, 503 U.S. 30, 37 (1992). "A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text . . . ." *Lane*, 518 U.S. at 192.

## A

Here, the court all but admits that the statutory term "actual damages" does not unequivocally express a waiver for nonpecuniary damages. According to our court's opinion, "there is *no ordinary or plain meaning* of the term actual damages." *Cooper*, 596 F.3d at 544 (emphasis added). Indeed, definitional analysis "*sheds little light* on the type of injury or loss Congress intended plaintiffs to be able to prove." *Id.* (emphasis added). In addition, the court concedes that two other circuits "agree[ ] that the meaning of the term actual damages is *ambiguous*." *Id.* at 545 (emphasis added). It also states that "we have recognized the *shifting sense* we have attributed to the term." *Id.* (emphasis added). The term, the court concludes, is a " '*chameleon*,' as its meaning changes with the specific statute." *Id.* (emphasis added). Our court's own rationale, therefore, indicates that the statute does not waive sovereign immunity for nonpecuniary damages.

## B

Notwithstanding such textual infirmities, the opinion resorts to the "clear purpose behind the [Privacy] Act" purportedly embodied in the Act's preamble, the way that Congress "signaled its intent" in the Act's recordkeeping provision, and the "presumption" that Congress intended the Act to mirror the Fair Credit Reporting Act. *Id.* at 545-48. But the proper conclusion to draw from the sources on which the court relies, if any can be drawn at all, is precisely the opposite of that drawn by the court. Assuming that recourse to a preamble is appropriate in the circumstances of this case, the Act's preamble uses the term "any damages," not the narrower term "actual damages." Privacy Act of 1974, Pub. L.

No. 93-579, § 2(b)(6), 88 Stat. 1896. That the preamble differs from the operative provision indicates a *difference* in meaning, not, as the court concludes, an *equivalence* in meaning. *Russello v. United States*, 464 U.S. 16, 23 (1983). In addition, the recordkeeping provision requires agencies to prevent "embarrassment" but, notably, does not state that such harm is compensable. 5 U.S.C. § 552a(e)(10). Finally, the court's intuiting of congressional intent from our interpretation of the term "actual damages" in the Fair Credit Reporting Act, *Cooper*, 596 F.3d at 547-48, conflicts with the statement mere pages earlier that the meaning of the term "actual damages" varies from statute to statute. *Id.* at 545.

Although my colleague's concurrence insists that the majority opinion "correctly construed the waiver to allow the recovery of nonpecuniary damages," Concurrence at 14244-45, the opinion itself concedes that if the term "actual damages is susceptible of two *plausible interpretations*, then the sovereign immunity canon requires the court to construe the term narrowly in favor of the Government [and] hold[ ] that nonpecuniary damages are *not* covered." *Id.* at 549-50 (emphasis added). The language used in the preamble and recordkeeping provision, and the various ways the term is used in other statutes, make evident that it is indeed susceptible to an alternative plausible interpretation. By its own logic, the court should have construed the term narrowly.

## C

But it is the court's recourse to the Privacy Act's standing provision that is the most troubling, because it conflicts with the Supreme Court's interpretation of the very provision of the Privacy Act at issue in this case. In *Doe v. Chao*, 540 U.S. 614 (2004), the Court distinguished standing to sue under the Privacy Act (which extends to all who suffer an "adverse effect") from the right to damages. The Court stated that the term "adverse effect" has the "limited but specific function" of "identifying a potential plaintiff who satisfies the injury-in-

fact and causation requirements of Article III standing." *Id.* at 624. "That is, an individual subjected to an adverse effect has injury enough to open the courthouse door, but without more has no cause of action for damages under the Privacy Act." *Id.* at 624-25. Here, the court jumbles the two concepts, interpreting the term "actual damages" broadly with respect to the type of damages available simply because the term "adverse effect" is interpreted broadly with respect to standing. *Cooper*, 596 F.3d at 546-47. Not appropriate, said the Supreme Court quite clearly in *Doe*. 540 U.S. at 624-25.

## II

It is apparent that this case involves an important question of federal law. "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *The Federalist No. 81*, at 548 (Alexander Hamilton) (Jacob E. Cooke ed., 1961). Sovereign immunity allows for majoritarian democracy, preventing the discouragement by courts of government action. *See* Harold J. Krent, *Reconceptualizing Sovereign Immunity*, 45 Vand. L. Rev. 1529, 1540 (1992). We ignore at our peril the well-established clear statement rule for waivers of sovereign immunity, which puts Congress, not the courts, in charge.

Concern over the impact of a waiver of sovereign immunity is particularly appropriate in this case. Even the dissent in *Doe*, which sought to expand damages under the Privacy Act, admitted that by its enactment "Congress did not want to saddle the Government with disproportionate liability." *Doe*, 540 U.S. at 637 (Ginsburg, J., dissenting). Congress was prescient. Because more and more government records are accessible online through the Internet, they are easier to share. The proliferation of electronic records raises the stakes of a broader waiver of sovereign immunity, increasing the fiscal exposure of the United States to the tune of a $1000 minimum statutory award per claim. 5 U.S.C. § 552a(g)(4)(A). Only Congress

has the keys to unlock our country's Treasury. The role of the courts is to ensure that Congress has used them in each case.

### III

For these reasons, I must respectfully dissent from the order denying rehearing en banc.

---

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

The Privacy Act of 1974, 5 U.S.C. § 552a *et seq.* (the Act), prohibits federal agencies from disclosing "any record which is contained in a system of records by any means of communication to any person, or to another agency" without the consent of "the individual to whom the record pertains," unless the disclosure falls within one or more enumerated exceptions to the Act. *Id.* § 552a(b). The Act also creates a private cause of action against an agency for its wilful or intentional violation of the Act that has "an adverse effect on an individual," and allows for the recovery of "actual damages" sustained as a result of such a violation. *Id.* § § 552a(g)(1)(D), (g)(4)(A).

Plaintiff Stanmore Cawthon Cooper claims to have sustained actual damages as the result of an interagency exchange of information performed as part of a joint criminal investigation by Defendants Federal Aviation Administration (FAA), Social Security Administration (SSA), and Department of Transportation (DOT) (collectively, the Government). Cooper seeks actual damages for nonpecuniary injuries, such as humiliation, mental anguish, and emotional distress, as a result of the unauthorized interagency disclosure of his medical information; he does not claim any pecuniary or out-of-pocket losses.

Because Cooper seeks damages only for nonpecuniary injuries, the district court granted summary judgment to the Government, after holding that the Act allows recovery only for pecuniary damages. We hold that actual damages under the Act encompasses both pecuniary and nonpecuniary damages. We reverse and remand to the district court.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Medical Certificates and Disability Benefits

Cooper first obtained a private pilot certificate in 1964 and has been flying airplanes intermittently ever since. To operate an aircraft lawfully, one must be issued a pilot certificate and a valid airman medical certificate. 14 C.F.R. § 61.3(a), (c). The FAA requires that a pilot periodically renew his or her medical certificate to ensure that the pilot satisfies current FAA medical requirements. *Id.* § 61.23. The medical certificate renewal application requires an applicant to disclose any illnesses, disabilities, or surgeries the applicant has had during his or her lifetime, and to identify any medications being taken at the time of application.

Cooper was diagnosed with HIV in 1985. He knew he would not qualify for a renewal of his medical certificate if he disclosed his medical condition because, at that time, the FAA did not issue medical certificates to individuals with HIV who were taking antiretroviral medications. Accordingly, Cooper grounded himself and chose not to renew his medical certificate.

In 1994, however, Cooper applied for and received a medical certificate from the FAA, but without disclosing that he had HIV or was taking antiretroviral medication. Cooper renewed his medical certificate again in 1998, 2000, 2002, and 2004, each time knowingly withholding required information about his medical condition. Cooper explains that he chose to withhold that information because of the "social stig-

ma" associated with HIV and his sexual orientation. Cooper feared that knowledge of his status as a gay man with HIV would result in discrimination against him in employment, housing, and public accommodation. As a result, he disclosed his sexual orientation and medical condition only to close friends and family.

In August 1995, after his symptoms worsened, Cooper applied to the SSA for long-term disability benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* Cooper disclosed his HIV status to the SSA, comfortable in his understanding that the medical information disclosed in his application would be held confidential and would only be used by the SSA for its determination of Cooper's eligibility for disability benefits. Cooper qualified for the benefits, which he received from August 1995 to August 1996.

## B.   Operation Safe Pilot

In 2002, the Office of the Inspector General (OIG) for the DOT and the OIG for the SSA, who are charged with investigating crimes related to their respective agencies, *see* 49 U.S.C. § 354(a) and 42 U.S.C. § 902(e), collaborated to investigate a California pilot who had consulted two different sets of doctors in a scheme to obtain simultaneously medical certifications to fly from the FAA and disability benefits from the SSA. From this investigation grew "Operation Safe Pilot," a joint criminal investigation conducted by the DOT-OIG and SSA-OIG that sought to uncover efforts by medically unfit individuals to obtain FAA certifications to fly. Operation Safe Pilot was initially proposed as a nationwide endeavor, but was ultimately approved as a regional project, limited to Northern California.

In July 2002, the FAA, which is part of the DOT, provided the DOT-OIG with the names and other identifying information for active certified pilots. In November 2003, the DOT-OIG sent the SSA-OIG information relating to approximately

45,000 pilots in Northern California, consisting of the pilots' names, dates of birth, social security numbers, and genders. The SSA-OIG cross-checked the DOT-OIG's information against the information in the SSA-OIG's databases, and in March or April 2004, the SSA-OIG provided the DOT-OIG with three separate spreadsheets summarizing its analysis: (1) a spreadsheet listing the names and social security numbers for the 45,000 pilots; (2) a spreadsheet listing pilots who had received Title II benefits; and (3) a spreadsheet listing pilots who had received Title XVI benefits. SSA-OIG and DOT-OIG agents then examined the spreadsheets to identify entries suggesting fraud.

## C.  The Investigation and Prosecution of Cooper

Upon review of the spreadsheets, the agents identified Cooper as a person of interest because the agencies' compiled data revealed that Cooper was certified to fly by the FAA, yet had received disability benefits from the SSA. Acting on that information, the agents acquired Cooper's medical file from the FAA, which revealed that Cooper had never disclosed his HIV to the FAA, and his disability file from the SSA, which contained information relating to Cooper's HIV.

In January 2005, the agents conducted a series of meetings with FAA Flight Surgeons to obtain their views as to whether the pilots identified by the investigation, including Cooper, had falsified their medical certificate applications and if so, whether that falsified information was material to the FAA's decision to certify the pilots. After reviewing Cooper's FAA medical file and SSA disability file, the FAA Flight Surgeons concluded that the FAA would not have issued Cooper an unrestricted medical certificate had it known of his HIV.

At that point, the agents arranged an interview with Cooper to ask him about his medical certificate applications. In March 2005, the agents met with Cooper, at which time he confessed to having intentionally withheld his medical condition from

the FAA. That same month, the FAA issued an emergency order revoking Cooper's pilot certificate due to his misrepresentations to the FAA.

In August 2005, Cooper was indicted on three counts of making false statements to a government agency under 18 U.S.C. § 1001. In 2006, he pleaded guilty to one count of making and delivering a false official writing, a misdemeanor under 18 U.S.C. § 1018. He was sentenced to two years of probation and fined $1,000.

## D.   The District Court's Decision

In March 2007, Cooper filed a lawsuit in the Northern District of California against the Government. Cooper alleged that the FAA, DOT, and SSA willfully or intentionally violated the Act by conducting their interagency exchange of his records. He claims that this unlawful disclosure caused him "to suffer humiliation, embarrassment, mental anguish, fear of social ostracism, and other severe emotional distress."

In spring 2008, both parties moved for summary judgment. The district court concluded there was no genuine issue of material fact that the Government had failed to uphold its record-keeping obligations under the Act, but that there was a triable issue of fact as to whether the Government's violation was intentional or willful. However, because the district court found the term "actual damages" to be ambiguous, and construed the waiver of sovereign immunity strictly in favor of the Government, it ruled against Cooper, holding that due to the strictly nonpecuniary nature of his damages, there was no genuine issue of material fact as to his having suffered actual damages under the Act. The district court never reached the issue of whether the Government's failure to comply with the Act proximately caused an adverse effect on Cooper.[1]

---

[1]Because the district court did not rule on whether Cooper had created a genuine issue of material fact on the proximate causation element of his claim, it has discretion to decide that issue on remand.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's grant of summary judgment de novo. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 639 (9th Cir. 2003). Viewing the evidence in the light most favorable to Cooper, we determine "whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

## III. DISCUSSION

The Act forbids federal agencies from disclosing an individual's records without that individual's written consent, unless the disclosure falls within one of the Act's narrow exceptions. 5 U.S.C. § 552a(b). Congress passed the Act " 'to protect the privacy of individuals identified in information systems maintained by Federal agencies' " by regulating " 'the collection, maintenance, use, and dissemination of information by such agencies.' " *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896). To that end, the Act furnishes federal agencies with "detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the [Act's] requirements." *Id.*

**[1]** If a federal agency fails to comply with the Act's record-keeping requirements, an individual may file a civil action against the agency in district court if the unauthorized disclosure has "an adverse effect" on the individual. § 552a(g)(1)(D). If the individual demonstrates "that the agency acted in a manner which was intentional or willful," the individual can recover "actual damages sustained by the individual as a result of the" agency's violation of the Act, "but in no case shall a person entitled to recovery receive less than the sum of $1,000." § 552a(g)(4)(A). Thus, to prevail on

a claim under the Act, a plaintiff must prove that: (1) the government agency failed to uphold its record-keeping obligation; (2) the agency acted intentionally or willfully in failing to execute its responsibility; (3) the failure proximately caused an adverse effect on the plaintiff; and (4) the plaintiff sustained actual damages. *Rose v. United States*, 905 F.2d 1257, 1259 (9th Cir. 1990).

In light of the ruling of the district court, the sole issue before us on appeal is the meaning of "actual damages" as used in the Act. The Supreme Court has not expressly addressed the issue. In *Doe v. Chao*, the Court held that the Act requires proof of "some actual damages" to recover the Act's minimum statutory damages of $1,000. 540 U.S. at 627. But the Court did not address "the precise definition of actual damages," though it recognized the disparate views of Courts of Appeals on the question. *Id*. at 627 n.12.

In *Fitzpatrick v. IRS*, the Eleventh Circuit held that actual damages "permits recovery only for proven pecuniary losses and not for generalized mental injuries, loss of reputation, embarrassment or other non-quantifiable injuries." 665 F.2d 327, 331 (11th Cir. 1982), *abrogated on other grounds by Doe*, 540 U.S. at 618; *see also Hudson v. Reno*, 130 F.3d 1193, 1207 (6th Cir. 1997) (adopting the Eleventh Circuit's position), *abrogated on other grounds by Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848 (2001). In *Johnson v. IRS*, the Fifth Circuit reached the opposite conclusion, holding that "the term 'actual damages' under the Act does indeed include damages for physical and mental injury for which there is competent evidence in the record." 700 F.2d 971, 972 (5th Cir. 1983), *abrogated on other grounds by Doe*, 540 U.S. at 618.

**[2]** Unlike the Fifth, Sixth, and Eleventh Circuits, we have not previously decided the meaning of actual damages under the Act. *See Rouse v. U.S. Dep't. of State*, 567 F.3d 408, 418 n.8 (9th Cir. 2009).

## A. Intrinsic Sources

Declaring the meaning of actual damages is a matter of statutory interpretation. "The purpose of statutory construction is to discern the intent of Congress in enacting a particular statute." *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999).

Our search for Congress's intent begins with "the plain meaning of the language in question." *United States v. 144,774 pounds of Blue King Crab*, 410 F.3d 1131, 1134 (9th Cir. 2005). If the relevant language is plain and unambiguous, our task is complete. *See United States v. Carter*, 421 F.3d 909, 911 (9th Cir. 2005). To discern the text's plain meaning, "words will be interpreted as taking their ordinary, contemporary, common meaning." *Id.* (internal quotation marks omitted).

**[3]** Unfortunately, there is no ordinary or plain meaning of the term actual damages because it is a legal term of art. As a result, ordinary dictionaries are of no assistance in clarifying the plain meaning of the term. *See Johnson v. Aljian*, 490 F.3d 778, 780 (9th Cir. 2007) ("[W]e follow the common practice of consulting dictionary definitions to clarify their ordinary meaning[ ] and look to how the terms were defined at the time [the statute] was adopted." (internal quotation marks omitted) (alterations in original)). Neither the *American Heritage Dictionary of English Language* nor *Webster's Third New International Dictionary* contains an entry for actual damages. *See generally American Heritage Dictionary of the English Language* (4th ed. 2000); *Webster's Third New International Dictionary* (2002).

*Black's Law Dictionary* defines "actual damages" as "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses." *Black's Law Dictionary* 445 (9th ed. 2009). Unfortunately, that definition sheds little light on the type of injury or loss Congress

intended plaintiffs to be able to prove under the Act. Simply because a statute authorizes the recovery of damages to compensate for injuries does not mean that the statute authorizes the recovery of damages for *any* type of loss. *See, e.g.*, *Naton v. Bank of Cal.*, 649 F.2d 691, 699 (9th Cir. 1981) (holding that pain and suffering damages are not allowed under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*); *Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460, 464 (9th Cir. 1977) (holding that actual damages for federal claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, are limited to economic loss).

**[4]** The Eleventh and Fifth Circuits, in *Fitzpatrick* and *Johnson*, agreed that the meaning of the term actual damages is ambiguous. In *Fitzpatrick*, the Eleventh Circuit concluded there is "no consistent legal interpretation" of actual damages, and observed that "courts have used 'actual damages' in a variety of circumstances, with the interpretation varying with the context of use." 665 F.2d at 329. In *Johnson*, the Fifth Circuit concluded that "the term 'actual damages' has no plain meaning or consistent legal interpretation." 700 F.2d at 974. Similarly, we have recognized the shifting sense we have attributed to the term. *In re Dawson*, 390 F.3d 1139, 1146 n.3 (9th Cir. 2004). The term is "chameleon," as its meaning changes with the specific statute in which it is found. *See Kucana v. Holder*, ___ S.Ct. ___, 2010 WL 173368, at *7 (Jan. 20, 2010).

**[5]** Since there is no plain meaning to the term actual damages, as used in the Act, we next consult the term in its statutory context, looking to the language of the entire statute, its structure, and purpose. *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006) ("[I]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." (internal quotation marks omitted)); *see also Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("A word in a statute may or may not extend to the outer lim-

its of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.").

**[6]** Congress articulated a clear purpose behind the Act, stating that "the right to privacy is a personal and fundamental right protected by the Constitution of the United States." Pub. L. No. 93-579, § 2(a)(4), 88 Stat. 1896. To protect that right, Congress passed the Act "to provide certain safeguards for an individual against an invasion of personal privacy by requiring federal agencies . . . to . . . be subject to civil suit for *any damages* which occur as a result of willful or intentional action which violates any individual's rights under this Act." *Id.* § 2(b)(6) (emphasis added).

**[7]** Congress's intent that the Act offer relief in the form of "any damages" resulting from a violation of one's right of privacy begs the question of what types of injuries typically result from the violation of such a right. The Supreme Court has observed that "[i]n the 'right of privacy' cases the primary damage is the mental distress from having been exposed to public view." *Time, Inc. v. Hill*, 385 U.S. 374, 386 n.9 (1967); *see also Restatement (Second) of Torts* § 652H(b) (1977) ("One who has established a cause of action for invasion of his privacy is entitled to recover damages for . . . his mental distress proved to have been suffered if it is of a kind that normally results from such an invasion . . . ."). The related common-law tort of defamation also provides monetary relief for nonpecuniary harms. In defamation cases, the Supreme Court has stated that "the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974). Accordingly, in her dissent in *Doe v. Chao*, Justice Ginsburg, commenting on the Act's purpose of providing relief for "any damages," stated "Act violations commonly cause fear, anxiety, or other emo-

tional distress—in the Act's parlance, 'adverse effects[,]' " and that in such cases, "emotional distress is generally the only harm the claimant suffers." 540 U.S. at 634 (Ginsburg, J., dissenting). One can readily envision circumstances in which these types of injuries might flow from the disclosure of one's confidential medical records, which often contain some of the most sensitive and intimate information about one's physical, mental, and emotional well-being, and sexual orientation. Given the nature of the injuries that most frequently flow from privacy violations, it is difficult to see how Congress's stated goal of subjecting federal agencies to civil suit for *any damages* resulting from a willful or intentional violation of the Act could be fully realized unless the Act encompasses both pecuniary and nonpecuniary injuries.

Congress signaled its intent, throughout the Act, to extend monetary recovery beyond pure economic loss. The Act obligates agencies to maintain a records system that "shall . . . establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, *embarrassment*, inconvenience, or unfairness to any individual on whom information is maintained." 5 U.S.C. § 552a(e)(10) (emphasis added). Further, the Act provides a civil remedy for an agency's failure "to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the . . . *character* . . . of . . . the individual that may be made on the basis of such record." *Id*. § 552a(g)(1)(C) (emphasis added). Congress's use of language to ensure that a federal agency's record-keeping practices do not result in embarrassment or harm to one's character bolsters a construction of actual damages that reaches nonpecuniary damages.

**[8]** Further, a contrary reading of the Act seems unreasonable in light of how we and other courts have construed the

term "adverse effect." The Act provides actual damages for intentional or wilful violations that have an adverse effect on an individual. Our circuit and at least seven others have recognized that a nonpecuniary harm, such as emotional distress, may constitute an adverse effect under the Act. *See Orekoya v. Mooney*, 330 F.3d 1, 7-8 (1st Cir. 2003) (holding that "provable emotional distress may constitute an adverse effect"), *abrogated on other grounds by Doe*, 540 U.S. at 618; *Doe v. Chao*, 306 F.3d 170, 181 n.6 (4th Cir. 2002); *Quinn v. Stone*, 978 F.2d 126, 135-36 (3d Cir. 1992) (holding that stress and emotional anguish can constitute adverse effects); *Englerius v. Veterans Admin.*, 837 F.2d 895, 897 (9th Cir. 1988) (agreeing with the D.C. Circuit and Tenth Circuit that "emotional trauma" can constitute an adverse effect); *Albright v. United States*, 732 F.2d 181, 186 (D.C. Cir. 1984) ("emotional trauma alone is sufficient to qualify as an 'adverse effect' under Section 552a(g)(1)(D) of the Act"); *Johnson*, 700 F.2d at 976-77; *Parks v. IRS*, 618 F.2d 677, 683 (10th Cir. 1980) (holding that "mental distress or embarrassment" could constitute an adverse effect). Even the Eleventh Circuit acknowledged in *Fitzpatrick* that humiliation or an emotional injury can qualify as an adverse effect. 665 F.2d at 331 & n.7. To recognize that the Act entitles one to actual damages for an adverse effect related to one's mental or emotional well-being, or one's character, as we and other circuits have previously done, while holding that one injured under the Act cannot recover actual damages for nonpecuniary injuries, would be an unreasonable construction of the Act. Indeed, such a reading would essentially render the provision of actual damages meaningless in cases where the plaintiff's injury relates to his or her character, or mental or emotional health, even though such cases are common under the Act. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)).

## B.   Extrinsic Sources

The parties in this case have argued at length about how the Act's legislative history supports their respective positions on the meaning of actual damages.

The statutory text itself is the "authoritative statement" of a statute's meaning. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). However, courts can and do consult extrinsic materials, such as legislative history, for guidance in construing an ambiguous statute. *See Oklahoma v. New Mexico*, 501 U.S. 221, 236 n.5 (1991) ("[W]e repeatedly have looked to legislative history and other extrinsic material when required to interpret a statute which is ambiguous[.]"). But courts resort to extrinsic materials "only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp.*, 545 U.S. at 568.

In this case, the Act's legislative history is not a reliable source for the meaning of actual damages because both sides of the argument can readily find support for their respective positions in that history. Accordingly, it is not surprising that in *Fitzpatrick* and *Johnson*, the Eleventh and Fifth Circuits conducted their own thorough reviews of the legislative history of the Act, only to arrive at diametrically opposing constructions of the same term. For these reasons, we decline to wade through the "murky, ambiguous, and contradictory" legislative history of the Act in the vain hope of finding clear guidance concerning the meaning of the term "actual damages." *Id.*

Moreover, legislative history is of no help to us in construing the scope of the Government's waiver of sovereign immunity at issue in this case, *see infra* Part III.C, because "the 'unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in statutory text. If clarity does not exist there, it cannot be supplied by a commit-

tee report." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 37 (1992).

However, one extrinsic source that does shed some reliable light on the meaning of the term actual damages in the Act is the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq*. In 1970, only four years before Congress passed the Act, Congress enacted the FCRA with the express purpose of requiring

> consumer reporting agencies [to] adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.

15 U.S.C. § 1681(b).

In enacting the FCRA, Congress recognized that this country's banking system has produced a complex system of credit reporting, involving consumer reporting agencies gathering and evaluating a wide range of personal and sensitive information, such as "credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Id.* § 1681(a)(2). Congress passed the FCRA to ensure that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's *right to privacy*." *Id.* § 1681(a)(4) (emphasis added); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) ("Congress enacted the FCRA in 1970 to . . . protect consumer privacy."). To that end, the FCRA prohibits credit reporting agencies from releasing consumer credit reports except as provided under 15 U.S.C. § 1681b(a).

Thus, not only did Congress enact the Act and the FCRA within a few years of each other, but they were passed to

address an identical concern growing out of closely analogous circumstances. In both cases, Congress acknowledged that vast databases of personal information are being gathered by agencies—in one case, federal agencies, and in the other, credit reporting agencies—and sought to circumscribe these agencies in the manner they gather, maintain, and use that sensitive information. Ultimately, Congress passed both laws with the purpose of protecting an individual's right of privacy from being violated by the disclosure of private information.

Further, the Act and the FCRA provide similar remedies. The FCRA creates a private right of action for injured consumers to recover any "*actual damages*" caused by an agency's negligent or willful violation of the FCRA. *See* 15 U.S.C. §§ 1681n, 1681o (emphasis added). Most importantly, we have held that actual damages under the FCRA encompass damages for emotional distress. *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1332-33 (9th Cir. 1995). Other courts have held similarly. *See, e.g.*, *Sloane v. Equifax Info. Servs.*, 510 F.3d 495, 500 (4th Cir. 2007); *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995); *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 513 (5th Cir. 1982).

**[9]** "[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion); *see also United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) (en banc) ("Moreover, courts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter."). The presumption is appropriate in this case. Therefore, our construction of the identical language in the FCRA, a statute closely analogous in purpose and time as the Act, is a reliable extrinsic source that buttresses a construction of the Act

to mean that actual damages encompass both pecuniary and nonpecuniary damages.[2]

**[10]** Having reviewed the text, purpose, and structure of the Act, as well as how actual damages has been construed in other closely analogous federal statutes, we hold that Congress intended the term actual damages in the Act to encompass both pecuniary *and* nonpecuniary injuries.

## C. Sovereign Immunity Canon

The district court held that the term actual damages is ambiguous and, consequently, applied the sovereign immunity canon in the Government's favor, construing actual damages narrowly to encompass only pecuniary damages. Our finding of clear congressional intent in the statute itself—its purpose, structure, and language—and external support in the language and construction of the FCRA mandates reversal of the district court's decision.

**[11]** The sovereign immunity canon holds that "[a] waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text." *Lane v. Pena*, 518 U.S. 187, 192 (1996). To the extent there are any ambiguities in the statutory text, those ambiguities must be strictly construed in favor of the sovereign. *Id.* Therefore, "[t]o sustain a claim that the Government is liable for awards of [nonpecuniary] monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims." *Id.*

---

[2]There are other federal statutes that allow for the recovery of actual damages, which courts have construed as including nonpecuniary damages, but we do not find those statutes to be as analogous in time, purpose, and subject matter to the Act. *See, e.g.*, *Anderson v. United Finance Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982) (holding that "actual damages" under the Equal Credit Opportunity Act, 15 U.S.C. § 1691e, may include "injury to credit reputation, and mental anguish, humiliation or embarrassment"); *Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119, 1121 (7th Cir. 1974) (holding that "actual damages" under the Fair Housing Act, 42 U.S.C. § 3612(c), may include damages for emotional distress and humiliation).

Cooper argues that the canon applies only where the initial waiver of immunity is in question. Because the Act expressly authorizes a private cause of action against the Government for damages, Cooper contends that the canon is of no use in construing the meaning of actual damages.

Cooper's position is not supported by applicable case law. In *United States v. Nordic Village, Inc.*, the Court applied the sovereign immunity canon to hold that 11 U.S.C. § 106(c) does not waive the federal government's sovereign immunity from an action seeking monetary recovery in bankruptcy. 503 U.S. at 33-39. The Court acknowledged that § 106(c)'s companion provisions, § 106(a) and § 106(b), plainly waive immunity with regard to monetary relief, and that § 106(c) waives immunity as to some form of relief (e.g., declaratory relief). *Id.* at 34. Despite the waiver, the Court did not limit its application of the sovereign immunity canon; it proceeded to analyze the canon as to the scope of the waiver. Because the language of § 106(c) was "susceptible of at least two interpretations that do *not* authorize monetary relief," the Court applied the canon to hold that § 106(c) "fails to establish unambiguously that the waiver extends to monetary claims," and ruled in the government's favor. *Id.* Thus, the sovereign immunity canon remains relevant and applicable beyond the initial waiver of sovereign immunity for purposes of gauging the scope of the waiver. *See Lane*, 518 U.S. at 192 ("[A] waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign.").

**[12]** Applying the canon to this case, if actual damages is susceptible of two plausible interpretations, then the sovereign immunity canon requires the court to construe the term narrowly in favor of the Government, holding that nonpecuniary damages are not covered. *See Siddiqui v. United States*, 359 F.3d 1200, 1203-04 (9th Cir. 2004) (applying the sovereign immunity canon in the government's favor because both parties had proposed conflicting yet plausible constructions of

the disputed statutory provision). For the reasons explained above in Part III.A-B, we conclude that when read in connection with the text of the entire Act, the Act's remedial scheme, and its underlying purpose of providing relief for "any damages" resulting from a violation of the privacy interests protected by the Act, the term actual damages is unambiguous. Given Congress's clear intent to furnish monetary relief for some injuries that are nonpecuniary in nature, and are proximately caused by an agency's wilful or intentional violation of the Act, we do not deem a construction that limits recovery to pecuniary loss plausible. *United States v. Williams*, 514 U.S. 527, 541 (1995) (Scalia, J., concurring) ("the rule requiring clear statement of waivers of sovereign immunity . . . . does not, however, require explicit waivers to be given a meaning that is implausible" (internal citation omitted)).

**[13]** The district court erred by failing to consider the full panoply of sources available to it for evaluating the scope of the Government's waiver of sovereign immunity under the Act. Rather, the district court relied on the sovereign immunity canon alone, to the exclusion of the traditional tools of statutory construction. "The sovereign immunity canon is just that—a canon of construction. It is a tool for interpreting the law, and we have never held that it displaces the other traditional tools of statutory construction." *Richlin Sec. Serv. Co. v. Chertoff*, 128 S. Ct. 2007, 2019 (2008); *accord Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (noting that "canons are not mandatory rules" but guides "designed to help judges determine the Legislature's intent," and that "other circumstances evidencing congressional intent can overcome their force").

**[14]** Moreover, the scope of a waiver of sovereign immunity can be ascertained only by reference to the congressional policy underlying the statute. *United States v. Oregon*, 44 F.3d 758, 766 (9th Cir. 1994) (citing *Franchise Tax Bd. v. U.S. Postal Serv.*, 467 U.S. 512, 521 (1984)); *see also Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 921-23 (9th Cir. 1995)

(reversing the district court's holding that the Settlement Act did not waive sovereign immunity as to prejudgment interest, concluding that the district court improperly applied the sovereign immunity canon by not looking to congressional purpose underlying the Settlement Act).

Congress enacted the Act to secure a citizen's "right to privacy [, which] is a personal and fundamental right protected by the Constitution of the United States." Pub. L. No. 93-579, § 2(A)(4). "Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interests they protect." *Carey v. Piphus*, 435 U.S. 247, 254 (1978). In connection with compensating constitutional injuries under 42 U.S.C. § 1983, another federal statute that seeks to provide compensation for injuries resulting from government misconduct, *see Carey*, 435 U.S. at 255-56, the Supreme Court has stated, "to further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question," *id.* at 258-59. Similarly, to achieve the policy underlying the Act, the privacy right should be tailored to the particular interests implicated by the Act. Those interests will, in most cases, result in injuries that go beyond mere financial loss (e.g., embarrassment, mental anguish, emotional distress). In light of the inherently noneconomic interests central to the Act, we cannot plausibly construe actual damages under the Act to exclude nonpecuniary damages.[3]

---

[3]The Government argues that even if actual damages include nonpecuniary injuries, we should affirm the district court based upon the insufficiency of Cooper's evidence regarding his nonpecuniary injuries. The district court, however, made no findings of fact as to the sufficiency of Cooper's evidence of nonpecuniary injuries. Accordingly, while we do not reach the issue of what type or amount of evidence Cooper must introduce into evidence to prove that he has sustained nonpecuniary damages under the Act, on remand, the district court has discretion to entertain motions from the parties regarding whether Cooper has proffered sufficient evidence of his nonpecuniary injuries to prove actual damages under the Act, and if so, to determine the proper amount of those damages.

## IV.  CONCLUSION

**[15]** Applying traditional tools of statutory interpretation, we hold that in using the term actual damages, Congress clearly intended that when a federal agency intentionally or willfully fails to uphold its record-keeping obligations under the Act, and that failure proximately causes an adverse effect on the plaintiff, the plaintiff is entitled to recover for both pecuniary and nonpecuniary injuries. As a result, we reverse and remand to the district court for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**